[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 195.]

THE STATE OF OHIO, APPELLEE, *v*. HILL, APPELLANT.

[Cite as *State v. Hill*, 1996-Ohio-222.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 95-202—Submitted December 6, 1995—Decided March 5, 1996.)

APPEAL from the Court of Appeals for Hamilton County, Nos. C-910916 and C-940487.

————————————

{¶ 1} On May 31, 1991, defendant-appellant, Genesis Hill, crept into his girlfriend's apartment in Cincinnati and surreptitiously removed their six-month old daughter, Domika Dudley. On June 2, police found Domika's body, wrapped in trash bags, in a vacant lot behind Hill's house.

{¶ 2} Hill, age nineteen, and Teresa Dudley, age eighteen, lived near each other and had an on-going relationship. Their daughter, Domika Dudley, was born in November 1990. Around May 29, 1991, Barbara Janson, a neighbor, heard Teresa "making silly little comments" to Hill that she was going to take him to court for child support. Hill replied that "he'd kill that little bitch before he paid anything." Teresa recalled Hill saying, "I bet I don't pay," when she asked him about child support.

{¶ 3} On May 31, in the late afternoon, Hill and Teresa were together in Hill's yard. Teresa became upset, they argued, and Teresa went home. That evening, Teresa went to sleep in her mother's second-floor apartment in the same room as Domika. Between 11:00 p.m. and midnight, Janson and another neighbor saw Hill enter the front yard of Teresa's apartment building, but they did not see Hill leave. That front entrance was the only entry way to her apartment except for the back yard which was enclosed by a high wall. Ten to fifteen minutes after the neighbors saw Hill, Teresa came out and said Domika was missing.

**{¶ 4}** Teresa went to Hill's home, but was told that Hill was not there and did not have the baby. Hill lived in the same building as did his uncle and two aunts. Just then, Hill appeared, but he denied knowing where his daughter was. A neighborhood search for Domika by police proved unsuccessful. Hill appeared unconcerned, did not participate in the search, and was "snickering" and "grinning" as Teresa talked to police about their missing baby.

**{¶ 5}** Around 5:45 a.m., June 1, Teresa and one of Hill's aunts found a distinctive blue and pink barrette on the floor of Hill's garage. That barrette was identical to one used in Domika's hair before she went to sleep.

**{¶ 6}** On the afternoon of June 2, police found a suspicious SMA® baby formula carton in an overgrown vacant lot behind Hill's garage. That box was not there on the day before when police searched the lot. Domika's body was inside the carton. A plastic shopping bag and three plastic trash bags had been successively wrapped around her body. Black electrical tape was wrapped around the outer trash bag.

**{¶ 7}** A man's blue shirt, with white and red stripes, was tied around Domika's head. Teresa and Janson identified this shirt as one that "looks like" a shirt Hill owned.

**{¶ 8}** Domika died as a result of three skull fractures, and she had been dead for more than twelve hours. Either a strong, blunt force had struck her head, or her head had been crushed. She might have been injured in a fall, but it seems only if another force had hit her during or after the fall. She was wearing only a diaper and two barrettes.

**{¶ 9}** The baby formula box, in which Domika was found, was similar to one that Hill's aunt had placed in the trash pile next to Hill's garage. The box was in the trash on June 1, but not on June 2. Batch numbers on a SMA® can from the aunt's pantry matched batch numbers on the box in which Domika was found. Hill's uncle was unable to find the black electrical tape that he kept in a tool box.

**{¶ 10}** A forensic expert testified that the last trash bag wrapped around Domika had once been directly attached to a trash bag found in Hill's kitchen. Microscopic grain, crease, and other distinctive marks made in the manufacturing process matched exactly on the two trash bags.

**{¶ 11}** At Teresa's apartment, police found Hill's right thumb print on a hallway light bulb near where Teresa and Domika had slept. When Teresa went to sleep that night, the hallway door had been partly open and the light had been on. When she awoke and discovered Domika missing, the light bulb was unscrewed.

**{¶ 12}** On the evening of June 2, the day Domika's body was found, a Cincinnati bus driver overheard a conversation on his bus. One young man, crying and upset, told another, "he could not believe what he had done to a little baby." The man further said, "he thought he might get the chair for it." After the bus driver heard the news about a dead baby, police were called. The bus driver picked Hill out of a photo array as the young man crying on the bus.

**{¶ 13}** A grand jury indicted Hill on two felony-murder counts in violation of R.C. 2903.01: murder during an aggravated burglary (Count I) and during a kidnapping (Count II). Each aggravated murder count contained two death-penalty specifications under R.C. 2929.04(A)(7)(murder during an aggravated burglary and murder during a kidnapping). Count III charged aggravated burglary in violation of R.C. 2911.11, and Count IV charged kidnapping in violation of R.C. 2905.01. Hill pled not guilty.

**{¶ 14}** At trial, numerous friends and relatives testified for Hill and described his activities on the evening of May 31. Defense witnesses suggested that only two trash bags had been in the kitchen; that Teresa was not a good mother; that she had been aggressive towards Hill on May 31; that she had access to the trash bags in Hill's kitchen; and that she may have "planted" the barrette on the garage floor.

**{¶ 15}** Hill testified as to his activities on May 31. He admitted he had been in the hallway, outside Teresa's door, around 11:00 p.m., and had unscrewed the light bulb. He claimed he only "whistled" to Teresa. When she did not answer, he left and went out the front, the same way he came in. He said he then "[w]ent on about [his] business" (drinking with friends). In his narrative testimony, Hill implicitly denied taking Domika, but he did not explicitly do so. Cross-examination revealed discrepancies between his testimony and his statements to police and two mental health professionals.

**{¶ 16}** The jury found Hill guilty as charged.

### Penalty Phase Evidence

**{¶ 17}** Numerous relatives testified regarding Hill's character. One aunt described him as "kind," "sweet," and "gentle." Another aunt said he was a "loving, caring" person who was always helpful. Others described him as a "good person," a "very nice person," "very outgoing," and one who "treats people very well." His grandparents and other relatives described the difficult environment in which Hill was raised and expressed their love and understanding for him. His juvenile case worker described him as "likable" and "respectable," although easily "intimidated."

**{¶ 18}** According to the record, Hill was born on June 7, 1971, and his mother suffered from serious depression and chronic emotional problems. Hill grew up in an extremely poor and drug-infested neighborhood, with a lot of "negative influences" and "temptations." His family was very poor. Hill's father, an ex-convict, had only a distant relationship with him and contributed little to his support or upbringing. Hill left school after the eighth grade.

**{¶ 19}** In his opening statement, trial counsel conceded Hill had a juvenile record for arson, burglary, resisting arrest, and tampering with a coin machine. Family members also disclosed that Hill had become involved with drugs and gangs

4

as a youngster, and had "sold drugs to have things *** to survive" and to support himself.

{¶ 20} Dr. Nancy Schmidtgoessling found Hill to be of average intelligence with the capacity to develop job skills and educate himself. However, Hill had always struggled academically. At fourteen, Hill started using drugs and alcohol. At sixteen, Hill had "problems with serious depression, and wrote suicide notes." At seventeen, a psychiatric evaluation found that he suffered from "major depression with psychotic features" and he reportedly experienced auditory hallucinations. But, in June 1991, Schmidtgoessling found that Hill was rational and intelligent, had no mental disease or defect, and was not suffering from major depression.

{¶ 21} In an unsworn statement, Hill said, "I feel hurt. Growing up was hard. A lot of things wasn't right for me," and he "struggled to survive." He was "sorry that you all have to be here," "sorry that the baby [was] gone," and "sorry for the family." He neither admitted nor denied killing Domika. After hearing the evidence, the jury recommended the death penalty.

{¶ 22} After the jury recommended death, Hill appeared before the judge for sentencing. At that hearing, Hill told the court that he was "sorry you have to judge me. *** [I] just hope and pray that you can spare my life." His probation officer asserted that Hill told him that he "did not brutally nor intentionally kill that baby. He told me it was an accident." After explaining its reasons, the trial court then imposed the death penalty.

{¶ 23} Upon appeal, the court of appeals affirmed the convictions and sentence of death. The case is now before us on an appeal as of right.

————————————

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Christian J. Schaefer*, Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle* and *Chuck R. Stidham*, for appellant.

---

**MOYER, C.J.**

{¶ 24} Appellant has raised twenty-six propositions of law. We have reviewed each and, for the reasons stated, we find that none justifies reversal of appellant's convictions for the crimes of aggravated murder, aggravated burglary, and kidnapping. We have also independently reviewed the record, weighed the aggravating circumstances against the mitigating factors, and examined the appropriateness and proportionality of the death sentence in this case. Upon review of the record, we affirm appellant's convictions and death sentence.

## I

### *Prosecutorial Misconduct-Penalty Phase*

{¶ 25} In his first and second propositions of law Hill contends that, at the close of the penalty phase of the trial, the prosecutor engaged in misconduct in the presentation of his closing argument. Hill claims that the prosecutor improperly attempted to focus the jury's attention upon nonstatutory aggravating circumstances in the form of evidence of the nature and circumstances of the crime, e.g., that the crime was brutal, and that the victim was defenseless. Hill complains of the prosecutor's comment on the victim's age, status, helplessness and injuries, as well as the fact that Domika was kidnapped while her mother slept.

{¶ 26} Hill's argument that the prosecutor engaged in misconduct by arguing nature-and-circumstances evidence is foreclosed by the syllabus in *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, where we held, as a matter of statutory interpretation of R.C. 2929.03(D), that a prosecutor at the penalty stage of a capital trial may introduce and comment upon, *inter alia*, evidence that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, and evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant. While Hill acknowledges *Gumm's* holding, he suggests that our interpretation of R.C. Chapter 2929 in *Gumm* invalidates

Ohio's entire death penalty statutory framework as unconstitutional.  He infers that this court is constitutionally required to impose severe restrictions upon the scope of a prosecutor's argument to the jury in the penalty phase of a capital trial, and that to do otherwise allows the imposition of an unreliable death sentence.

**{¶ 27}** We reject Hill's arguments, which, in large part, are repetitious of those made in *Gumm*.  As we there recognized, the United States Supreme Court has consistently relied upon the premise that both the criminal *and his crime* are properly considered in determining the propriety of imposing a death sentence.  Similarly, while recognizing that a sentence of death may not be made under sentencing procedures that create a substantial risk of being inflicted in an arbitrary and capricious manner, that court nevertheless has approved of the presentation of  a "wide scope of evidence and argument *** at presentence hearings."  *Gregg v. Georgia* (1976),  428 U.S.  153, 203-204,  96  S.Ct.  2909, 2939,  49  L.Ed.2d  859,  891-892.   See, e.g., *California v. Ramos* (1983), 463 U.S. 992, 1008, 1035 S.Ct. 3446, 3457, 77 L.Ed.2d 1171, 1185; *Gumm* at syllabus.  The court has expressly refused to "fashion general evidentiary rules, under the guise of interpreting the Eighth Amendment, which would govern the admissibility of evidence at capital sentencing proceedings."  *Romano v. Oklahoma* (1994), 512 U.S. ____, 114 S. Ct. 2004, 2011, 129 L. Ed. 2d 1, 12-13.

**{¶ 28}** In the penalty phase of a capital trial, an Ohio jury is statutorily required to "consider" all of the evidentiary factors identified in the first paragraph of R.C. 2929.03(D)(1).  Our syllabus in *Gumm*  reflected that statutory provision. The second paragraph of  R.C.  2929.03(D)(1)  provides,  however,  that  the  jury's  ultimate recommendation as between a life or death sentence is dependent upon the jury's balancing of whether the "aggravating circumstances the defendant was found guilty of committing" (i.e., the R.C. 2929.04 specifications identified in the indictment) "are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death."  In *Gumm*, we  recognized it to be improper for a prosecutor to argue to a jury that  individual  facts  surrounding  an  aggravated  murder  "are  the  aggravating

circumstances" in a death penalty case. Such statements are improper, however, not because they seek to focus the jury's attention on the facts surrounding the crime, but rather because they misstate Ohio law. Nature-and-circumstances facts are not "aggravating circumstances" as the term is used in R.C. 2929.03 and 2929.04, or as that term is properly incorporated into jury instructions given to guide a jury in coming to its ultimate recommendation. At the same time, however, pursuant to R.C. 2929.03(D) as interpreted in *Gumm,* a prosecutor may incorporate proven facts surrounding a murder into the state's closing argument even when those proven facts could increase rather than decrease the likelihood that a sentence of death will ultimately be recommended. Cf. *Romano v. Oklahoma*, 512 U.S. at _____, 114 S.Ct. at 2009-2010, 129 L.Ed.2d at 10-11.

{¶ 29} Our holding in *Gumm* is necessary in order to harmonize the various subsections of R.C. 2929.03(D). Acceptance of Hill's argument would effectively eliminate the first paragraph of R.C. 2929.03(D)(1), as well as the first phrase of R.C. 2929.03(D)(2), both of which require a jury to "consider" a wide range of evidence during the penalty phase of the trial, as well as counsel's arguments.

{¶ 30} We will not interpret Ohio's capital sentencing statute to require a jury to make its recommendation between life and death in a factual vacuum. Nor will we accept an interpretation of Ohio's statutes which runs the risk of resulting in the same kind of unbalanced presentation found unnecessarily unfair to the state in *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, where "'a parade of witnesses may praise the background, character and good deeds of Defendant \*\*\* without limitation as to relevance, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.'" *Id.*, 501 U.S. at 826, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. We will not sanction a procedure by which counsel for a criminal defendant is provided full opportunity to vigorously argue the full range of mitigating evidence procured on behalf of his or her client, while his adversary, the prosecutor, is precluded from vigorously arguing the entire scope of facts surrounding

the act of murder of which the defendant has been convicted. We instead affirm the view of Justice Cardozo, as did the majority of the United States Supreme Court in *Payne*, that "'[j]ustice, though due to the accused, is due to the accuser also.'" *Id.* at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736, citing *Snyder v. Massachusetts* (1934), 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674, 687. In short, a capital defendant in Ohio is not statutorily or constitutionally entitled to protection during the sentencing process from the facts he himself created in committing his crime.

{¶ 31} Our conclusions are reinforced by the recognition that there is no constitutional requirement that aggravating circumstances be "weighed against" mitigating factors, nor does the Constitution require that the sentencing process "be transformed into a rigid and mechanical parsing of statutory aggravating factors." *Barclay v. Florida* (1983), 463 U.S. 939, 950, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134, 1144. Similarly, "[i]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." *Payne*, at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. The Eighth Amendment to the United States Constitution does require, however, that a defendant be found guilty of at least one valid, limiting, statutory aggravating circumstance, and that the defendant be provided full opportunity to present evidence in mitigation. *Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235. Our interpretation of Ohio's death penalty statutes preserves these constitutional requisites, and guards against arbitrary imposition of a death sentence by limiting the class of death-eligible murderers to those who are found guilty of at least one of the statutorily-defined aggravating circumstances enumerated in R.C. 2929.04(A).

{¶ 32} Hill concedes that defense counsel made no objection whatsoever to any portion of the prosecutor's argument. Because Hill failed to object at trial, his challenges to the prosecutor's argument must be analyzed according to plain-error standards, and his death sentence should be reversed only if error is found and that error is deemed to have denied him a fair trial. *State v. Wade* (1978), 53 Ohio St.2d

9

182, 7 O.O.3d 362, 373 N.E.2d 1244; *State v. Campbell* (1994), 69 Ohio St.3d 38, 41, 630 N.E.2d 339, 345. The United States Constitution does not require us to hold that the traditional prosecutorial role of vigorously presenting and arguing admissible evidence must or should be restrained in a capital case beyond the limits constitutionally required in other criminal cases. A death sentence need not be reversed on constitutional grounds even when prosecutorial comment is "'undesirable or even universally condemned,'" unless the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright* (1986), 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144, 157.

{¶ 33} While the prosecutor did improperly characterize the facts surrounding the crime as "the aggravating circumstances," misstatements of that nature do not mandate reversal of Hill's sentence, where, as here, the trial court correctly instructed the jury as to the precise aggravating circumstances, thereby negating any confusion arising from the prosecutor's imprecision. *See Gumm* at 422, 653 N.E.2d at 263. See, also, *Romano v. Oklahoma*, 512 U.S. at ___, 114 S.Ct. at 2012, 129 L.Ed.2d at 13-14.

{¶ 34} The prosecutor commented on Hill's prior criminal record (including delinquency adjudications for burglary, arson, breaking into a coin box, resisting arrest), his history as a drug dealer, and his mental condition. Hill, however, offered extensive character evidence, and Hill's own witnesses and opening statement during the sentencing proceeding discussed the topics he now complains about. The prosecutor could fairly comment on facts properly in evidence and argue the relative value of mitigation offered. *State v. Greer* (1988), 39 Ohio St.3d 236, 253, 530 N.E.2d 382, 402; *State v. Clark* (1988), 38 Ohio St.3d 252, 254-255, 527 N.E.2d 844, 848-849. Thus, the prosecutor properly argued the relative mitigating weight that should be given to accused's age. *See Gumm*, at syllabus.

{¶ 35} Hill also complains the prosecutor asked the jury to perform "a necessary function to maintain the civilized order in society" and commented that "the ultimate punishment must be inflicted to maintain a civilized law and order[ed] society." Yet this brief comment, responding to a defense argument referring to the Bible, in the context of Hill's entire trial, did not rise to the level of a denial of due process. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 571, 605 N.E.2d 884, 899; *State v. Beuke* (1988), 38 Ohio St.3d 29, 33, 526 N.E.2d 274, 280.

{¶ 36} Error arising from the prosecutor's excessive comment on the unsworn nature of Hill's statement and the fact that Hill could not be cross-examined, if any, was harmless. See *State v. Lorraine*, 66 Ohio St.3d at 419, 613 N.E.2d at 218; *State v. DePew* (1988), 38 Ohio St.3d 275, 284; 528 N.E.2d 542, 553. Hill's second proposition of law asserting error in the overruling of a motion *in limine* to limit the prosecution's argument lacks merit since the denial of a motion *in limine* does not preserve a claimed error for review in the absence of a contemporaneous objection at trial. *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus.

{¶ 37} In proposition twelve, Hill argues the prosecutor improperly cross-examined a defense psychologist as to whether Hill suffered from a mental disease or defect or understood right from wrong. However, Hill introduced evidence as to his past mental problems and his psychological and mental condition in an effort to prove a mitigating "other factor." See R.C. 2929.04(B)(7). The prosecutor's cross-examination helped define the parameters of the defense claims, and was not improper. See Evid.R. 611(B); *State v. Evans* (1992), 63 Ohio St.3d 231, 244, 586 N.E.2d 1042, 1054.

## II

### *Prosecutorial Misconduct-Guilt Phase*

{¶ 38} In his third proposition of law, Hill argues the prosecutor's guilt-phase argument was improper. In final argument, the prosecutor "tossed" a shirt

11

on defense counsel's table, and the shirt "slid on the slick surface and came to rest on the table in front of" Hill and "may have" contacted Hill's hands. Hill responded, "Don't throw that at me," and Hill's counsel objected. The trial court did not observe any "contact" between Hill and the shirt.

{¶ 39} "[T]he touchstone of due-process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87; see *State v. DePew*, 38 Ohio St.3d at 284, 528 N.E.2d at 553. The prosecutor may well have improperly handled the exhibit by tossing it on the defense table. Yet, assuming *arguendo* that the toss of the shirt was improper, we find no prejudice to Hill in light of the overwhelming evidence of his guilt. Compare *State v. Webb* (1994), 70 Ohio St.3d 325, 328, 638 N.E.2d 1023, 1028; *State v. Landrum* (1990), 53 Ohio St.3d 107, 110, 559 N.E.2d 710, 717.

{¶ 40} Hill also complains the prosecutor suggested that Hill lacked remorse, that he lied in testimony, and that his counsel tried to confuse the jury. However, Hill failed to object to these remarks and thus waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 924-925; Crim.R. 52(B).

{¶ 41} We find neither plain nor prejudicial error. Counsel could legitimately point out that Hill did not react when scenes of his dead child were shown. An accused's face and body are physical evidence, and a prosecutor can comment on them. *State v. Lawson* (1992), 64 Ohio St.3d 336, 347, 595 N.E.2d 902, 911; *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538. The prosecutor also referred to defense counsel making "an effort really to defend the client, but also to confuse the jury, which I think goes hand in hand[.]" The comment, read in full context, represented an inartful attempt to convince the jury that defense counsel's interpretation of the evidence should be rejected. We do not believe the comment deprived Hill of a fair trial.

**{¶ 42}** The prosecutor improperly interjected his personal opinion that Hill lied. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400. Yet, the prosecutor did not suggest that the jury should doubt Hill's credibility based simply on the fact that the prosecutor believed him to be a liar, but rather referred to evidence of Hill's inconsistent statements, which suggested falsity. Moreover, Hill can scarcely complain since his counsel repeatedly used variations of personal belief, "I think" or "I believe," in the preceding argument. See, *e.g., State v. Rogers* (1986), 28 Ohio St.3d 427, 28 OBR 480, 504 N.E.2d 52, paragraph two of the syllabus.

**{¶ 43}** Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431. A closing argument must be viewed in its entirety to determine prejudice. *State v. Byrd* (1987), 32 Ohio St.3d 79, 82, 512 N.E.2d 611. Viewed in its entirety, the prosecutor's mistakes in argument neither materially prejudiced Hill nor denied him a fair trial. See *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082, 1102.

**{¶ 44}** In proposition eighteen, Hill argues the prosecutor improperly showed a photo of Domika's body to witness Teresa Dudley, and asked her to identify it. Teresa reacted emotionally, started sobbing, and left the stand. Hill's counsel moved for a mistrial and asserted she was still "screaming and yelling" in the hall six to ten minutes later. However, Teresa resumed testifying without further incident or reference to the photograph.

**{¶ 45}** The impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record. "Was the jury disturbed, alarmed, shocked or deeply moved? *** These questions necessarily depend upon facts which no record can reflect." *State v. Bradley* (1965), 3 Ohio St.2d 38, 40, 32 O.O.2d 21, 22, 209 N.E.2d 215, 216. Normally, only the trial judge can make the necessary factual determinations on these questions. "[H]is findings thereon will

13

not be disturbed on review in the absence of evidence on the face of the record clearly and affirmatively showing that the jury was improperly affected ***." *Bradley* at 41, 32 O.O.2d at 22, 209 N.E.2d at 217. Accord *State v. Morales* (1987), 32 Ohio St.3d 252, 255, 513 N.E.2d 267, 271.

{¶ 46} The prosecutor did not err by placing Teresa on the stand, nor by showing her the child's photo. She was an essential witness relating relevant, crucial testimony. She testified about Hill's refusal to support Domika and his breaking their window, with a brick, causing her mother to banish Hill. Teresa identified the shirt wrapped around Domika's body as identical to one Hill owned. Teresa placed three barrettes in Domika's hair that night; she later found one on the floor in Hill's garage. Showing her the photo of Domika's body was a natural part of her testimony. Domika was taken from her presence. Only Teresa could readily confirm Hill's identity as the father or testify that he lacked her permission to enter the apartment or take Domika.

{¶ 47} In fact, Hill cross-examined Teresa extensively and elicited favorable testimony. Teresa confirmed she had no custody order and that Hill treated children kindly and had once taken Domika with permission. Teresa also agreed she permitted Hill to visit her, and that she and Hill were involved in an ongoing sexual relationship.

{¶ 48} Nothing suggests that the prosecutor called Teresa to evoke sympathy or an emotional outburst. Compare *State v. Tyler* (1990), 50 Ohio St.3d 24, 35, 553 N.E.2d 576, 591; *State v. Williams* (1988), 38 Ohio St.3d 346, 354, 528 N.E.2d 910, 919. The trial court instructed the jury not to be influenced by sympathy or prejudice. Under all the circumstances, no "clear, affirmative evidence" exists that Teresa's earlier outburst deprived Hill of a fair trial. *State v. Morales*, 32 Ohio St.3d at 255, 513 N.E.2d at 271. Thus, we reject proposition eighteen.

**III**

*Sufficiency of Evidence*

**{¶ 49}** In propositions of law thirteen through sixteen, Hill argues the evidence was insufficient to sustain his convictions. In a review for sufficiency following a conviction, we must consider the evidence in a light most favorable to the prosecution. *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Moreover, the evaluation of the weight of the evidence and credibility of witnesses are jury issues. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. We find the evidence adequately proved Hill's guilt of aggravated murder, kidnapping, and aggravated burglary.

**{¶ 50}** The evidence supported the jury's finding that Hill was Domika's killer. Two witnesses identified Hill as entering Teresa's yard within fifteen minutes of Domika's disappearance. They did not see him leave. Hill admitted he was there, and his thumbprint on the unlit hall light bulb confirmed this. Domika's body was found in a vacant lot behind his garage. Hill's shirt and trash bags from his apartment were wrapped around her body. She had been stuffed in a carton, which had been earlier discarded near Hill's garage. Her barrette was found on Hill's garage floor. Finally, a disinterested bus driver reported that, on the day Domika was found dead, Hill said that he would "get the chair" for what he did to a baby.

**{¶ 51}** Hill argues that no proof exists that he purposefully killed Domika. However, Domika died as a result of multiple blunt force or blunt impacts to her head. Her three skull fractures could not have been caused by a simple fall. Violent shaking, in addition to blunt trauma, may have contributed to her death, but the coroner concluded Domika died as a result of homicide, not accident. Hill had vowed never to pay child support and to "kill that little bitch" first. In view of

15

Domika's injuries and Hill's declared intentions, the jury could reasonably find that Hill purposefully killed Domika.

{¶ 52} In proposition of law fourteen, Hill argues that as Domika's natural father, he has equal rights to her custody under Ohio law and cannot be convicted of kidnapping her. Admittedly, R.C. 3109.03 specifies that when a husband and wife are divorced or living separate and apart, "they shall stand upon an equality as to the parental rights and responsibilities ***." *Pasqualone v. Pasqualone* (1980), 63 Ohio St.2d 96, 100, 17 O.O.3d 58, 61, 406 N.E.2d 1121, 1124, recognized that "[i]n the absence of an agreement or binding court order, parents have equal rights to custody ***." Accord *In re Corey* (1945), 145 Ohio St. 413, 31 O.O. 35, 61 N.E.2d 892. However, R.C. 3109.03 deals with a husband and wife, not the rights of a putative father who has neither acknowledged paternity nor supported the child. See, also, R.C. 3109.12; 3111.03.

{¶ 53} Moreover, R.C. 2905.01(A), in defining the crime of kidnapping, specifies that, "No person *** [if under thirteen, by any means] shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes: *** (3) To terrorize, or to inflict serious physical harm on the victim *** ." No exception is made for either a father or mother. Other deprivation-of-liberty crimes, with different elements, specifically exclude parents by use of the term, "without privilege to do so." See R.C. 2905.02; 2905.03; 2905.05. See, also, R.C. 2905.04(C). We find that the absence of any reference to privilege in R.C. 2905.01 evinces a clear legislative intent to forbid kidnapping by any person regardless of parental rights.

{¶ 54} Hill took Domika from her mother's presence, without waking the mother, and therefore clearly did not kill her at the scene. Approximately thirty minutes later, Hill reappeared without Domika. The jury could find that the injuries inflicted closely followed the kidnapping in time, but they were distinct and separate offenses. *State v. Simko* (1994), 71 Ohio St.3d 483, 488, 644 N.E.2d 345,

16

351; see *State v. Morales*, 32 Ohio St.3d at 255-256, 513 N.E.2d at 272. The jury could also reasonably find Hill intended to inflict serious harm at the time he took Domika. Thus, the evidence supports the jury's verdict of guilt of the crime of kidnapping.

{¶ 55} Hill further argues he had permission to enter the Dudley residence at any time; hence, he could not be guilty of burglary. At trial, Teresa acknowledged that Hill was allowed to visit the hallway. He also regularly visited her apartment and spent the night there.

{¶ 56} However, Teresa denied Hill had permission "that night" to visit her apartment. Also, Hill admitted to police and testified that he had broken a Dudley apartment window some three months before. As a result, Teresa's mother refused to allow Hill to come back, and Teresa confirmed this. In sum, the jury could reasonably find Hill lacked consent for entry. Moreover, his unauthorized taking of Domika would have revoked any prior consent. See *State v. Bonnell* (1991), 61 Ohio St.3d 179, 183, 573 N.E.2d 1082, 1086; *State v. Steffen* (1987), 31 Ohio St.3d 111, 115, 31 OBR 273, 509 N.E.2d 383, 388-389.

{¶ 57} Hill further argues that the jury's consideration of two unproved capital specifications skewed the weighing process. However, the evidence proved Hill's guilt, as the principal offender, of both the kidnapping and aggravated burglary death-penalty specifications. Thus we reject propositions of law thirteen through sixteen.

## IV

### *Admission of accused's statements / Search results*

{¶ 58} In proposition seventeen, Hill argues the trial court erred in admitting rebuttal prosecution evidence as to pretrial statements he made during court-ordered interviews about his mental condition. In his testimony, Hill denied previously saying he had been at a family picnic all day. In rebuttal, a psychiatrist and a mental health interviewer testified that Hill told them that he had spent all

17

day May 31 at a family picnic. Hill argues these statements were inadmissible because these mental health professionals did not advise him of his *Miranda* rights and his counsel was not present.

{¶ 59} However, the prosecutor could properly impeach Hill with evidence of these prior inconsistent statements. Evid.R. 613(B). Under *Harris v. New York* (1971), 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, the state can use an accused's voluntary, but un-*Mirandized* statement, to impeach trial testimony. "The shield provided by *Miranda* [*v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694] cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris*, 401 U.S. at 226, 91 S.Ct. at 646, 28 L.Ed.2d at 5. Accord *State v. Maupin* (1975), 42 Ohio St.2d 473, 480-481, 71 O.O.2d 485, 330 N.E.2d 708, 714. *Michigan v. Harvey* (1990), 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293, reaffirming *Harris,* held that an accused's voluntary statement could be used to impeach even when the statement was taken in violation of the right to have counsel present.

{¶ 60} Here, Hill voluntarily talked to trained listeners and had an opportunity on the stand to explain his statements. *Harris* and *Harvey* permit such rebuttal evidence. *Estelle v. Smith* (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, concerns direct, not rebuttal, use of evidence and is not on point. Also, while Hill objected to being cross-examined as to his prior statements, he did not object to the rebuttal testimony and waived the issue.

{¶ 61} In proposition of law twenty-two, Hill argues his pretrial statements to police were inadmissible. In his June 1 and June 4 statements, Hill denied responsibility and described his activities on May 31 and June 1. As Hill points out, these statements were inconsistent with each other and with his trial testimony. At a suppression hearing, Hill testified police never advised him of his rights and that he signed *Miranda* forms without reading them. Police officers testified that

they informed Hill of his rights, that he read and signed the *Miranda* forms, and that he talked freely and willingly.

**{¶ 62}** "[T]he weight of the evidence and credibility of witnesses are primarily for the trier of the facts. *** This principle is applicable to suppression hearings as well as trials." *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584. The trial court chose not to believe Hill and rejected his motion to suppress. The police testimony supports admissibility, and we find no basis to reverse the trial court. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982; *State v. Smith* (1991), 61 Ohio St.3d 284, 287-288, 574 N.E.2d 510, 514-515.

**{¶ 63}** In proposition twenty-three, Hill challenges the admission of evidence, principally the trash bags, seized from his residence on June 2. Hill testified that police never explained the search-consent form which he and his uncle signed but did not read. But police officer Robert Steinher testified that he thoroughly explained the consent form, and Hill and his uncle both signed it.

**{¶ 64}** The trial court resolved the conflicting testimony and rejected Hill's motion to suppress. The totality of the circumstances supports the voluntariness of Hill's consent. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854; *State v. Barnes* (1986), 25 Ohio St.3d 203, 208-209, 25 OBR 266, 271, 495 N.E.2d 922, 926. We reject propositions seventeen, twenty-two and twenty-three as lacking merit.

## V

### *Verdict Form/Correction of the Record*

**{¶ 65}** In his fourth and fifth propositions, Hill argues his rights were infringed because the jury's sentencing verdict originally showed a November 19, 1991, file stamped date although the trial's penalty phase did not begin until November 20 and ended November 22, 1991.

**{¶ 66}** On December 28, 1993, the trial court held hearings on this issue. A contemporaneous clerical note on the indictment shows the jury sentencing verdict was rendered on November 22, as does the trial transcript. The prosecutor also testified that the jury did not reach any verdict before the hearing and only one death penalty verdict form existed. That form, given to the jury on November 22, at the end of the penalty hearing, was blank and unsigned by jurors. After arguments and evidence, the trial court corrected the record to change the journal entry date on the jury's verdict form to November 22.

**{¶ 67}** In this case, Hill continues to argue an issue he lost in his prior attempt to stop the trial court from correcting this record. In *State ex rel. Hill v. Niehaus* (1994), 68 Ohio St.3d 507, 508, 628 N.E.2d 1376, 1377, we held "[t]he trial court has authority to resolve disputes and correct factual errors in a trial record, including disputes over when a verdict form was filed ***." Accord App.R. 9(E); Crim.R. 36. Evidence at the hearing supports the trial court's ruling, and we find no basis to reverse that ruling or our decision in *State ex rel. Hill v. Niehaus*, *supra*. We reject Hill's fourth and fifth propositions.

**{¶ 68}** We note another oversight relating to verdict forms in this case. In referring to the life verdict form, the trial court read it as, "We, the jury, in the issue joined, find the *mitigating factors outweigh the aggravating circumstances* *** and recommend *** [life without parole consideration for thirty or twenty full years] [emphasis added]." However, Hill waived the issue by not objecting at trial or at the court of appeals.

**{¶ 69}** We find no plain error. The verdict form the jury signed and the court's instructions stated the correct standard that aggravating circumstances must outweigh mitigating factors beyond a reasonable doubt. *State v. [Jeffrey] Hill* (1995), 73 Ohio St.3d 433, 437-438, 653 N.E.2d 271, 277. Nonetheless, we urge trial judges and counsel to use the utmost caution and precision in referring to the absolute requirement that aggravating circumstances outweigh mitigating factors

beyond a reasonable doubt before the death sentence can be imposed. R.C. 2929.03.

## VI

### *Defects in prior sentencing opinions*

{¶ 70} In his sixth through eighth propositions of law, Hill attacks the sentencing opinions issued by the trial court and court of appeals. We reject any claims of reversible error.

{¶ 71} As Hill points out, the trial court erred in not filing its sentencing opinion until April 1, 1993, although it imposed the death penalty on December 6, 1991. R.C. 2929.03(F) requires sentencing opinions to be filed within fifteen days of the imposition of a death sentence. However, Hill was not prejudiced. At the time he imposed the death sentence, the trial judge explained his reasons. Hill's appeal was not delayed, and Hill had full opportunity to argue to the court of appeals (as well as this court) any asserted deficiency in the written opinion. See *State v. Martin* (1985), 19 Ohio St.3d 122, 132, 19 OBR 330, 339, 483 N.E.2d 1157, 1166-1167; see *State v. Scott* (1986), 26 Ohio St.3d 92, 105, 26 OBR 79, 90, 497 N.E.2d 55, 66.

{¶ 72} Hill also argues the trial court failed to articulate reasons why the aggravating circumstances outweighed mitigating factors. However, the trial judge did evaluate the mitigating factors presented at the time he sentenced Hill. Moreover, our "independent review of a sentence will cure any flaws in the trial court's opinion." *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131; *State v. Lewis* (1993), 67 Ohio St.3d 200, 204, 616 N.E.2d 921, 925; and *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304, all held that a trial court's failure to explain why aggravating circumstances outweighed mitigating factors may be corrected by our independent sentence assessment.

{¶ 73} We reject Hill's claim that the trial court erred in evaluating mitigating evidence. "In fact, the assessment and weight to be given mitigating

evidence are matters for the trial court's determination." *State v. Lott* at 171, 555 N.E.2d at 305; *State v. Fox* at 193, 631 N.E.2d at 132. Even if there were errors, our independent reassessment will cure them. *Lott*, *supra*.

{¶ 74} Hill further argues for rejection of the death sentence because the trial court found that Hill was innocent and "mercy should be granted." Admittedly, the trial court wrote imprecisely, "The Court finds that the mitigating circumstances were that the defendant was young and innocent and that mercy should be granted in imposing sentence."

{¶ 75} However, Hill's claim that the trial judge thought Hill innocent of the crimes and specifications set forth in the indictment is inaccurate. Earlier in the opinion, the trial court specifically found that "[t]he defendant was guilty of purposely taking the life of a child *** ." Further, "[t]he Court finds that as a principal offender the defendant kidnapped a young child and purposely killed the child during the course of the kidnapping and aggravated burglary."

{¶ 76} The court's contemporaneous sentencing remarks also refute any claim the judge thought Hill innocent: "You irresponsibly created a life, brought into this world a child unwanted, unloved, and uncared for by you *** [.] Then, to avoid responsibility for this action, you took that life coldly and calculatingly, simply to avoid your responsibilities." Again, any deficiency in the trial court's opinion is cured by our independent sentence reassessment. *Lott, supra*.

{¶ 77} Hill also attacks the opinion of the court of appeals because it fails, in Hill's view, to state why the aggravating circumstances outweigh mitigating factors. However, we find the court of appeals carefully evaluated the aggravating circumstances and Hill's mitigating evidence in its independent sentence assessment. Within that assessment, the court of appeals explained why it found the aggravating circumstances outweighed mitigating factors.

{¶ 78} Moreover, only R.C. 2929.03(F), applicable to trial courts, imposes a requirement for explaining "the reasons why the aggravating circumstances ***

outweigh the mitigating factors."   No such requirement exists in R.C. 2929.05, which governs appellate sentencing decisions.   Finally, our independent sentence assessment can cure any deficiency in the court of appeals' opinion.   *State v. Simko,* 71 Ohio St.3d at 493, 644 N.E.2d at 354; *State v. Green* (1993), 66 Ohio St.3d 141, 150, 609 N.E.2d 1253, 1261.

## VII

### *Ineffective Assistance*

**{¶ 79}** In his ninth proposition, Hill claims his counsel was ineffective during his trial.   However, reversal of a conviction or sentence on ineffective assistance requires that the defendant show, first, that "counsel's performance was deficient" and, second, that "the deficient performance prejudiced the defense *** so as to deprive the defendant of a fair trial."   *Strickland v. Washington* (1984), 466 U.S. 668, 687, 693, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

**{¶ 80}** Hill fails to establish his counsel's performance fell "below an objective standard of reasonable representation."   *State v. Bradley*, at paragraph two of the syllabus.   Counsel need not raise meritless issues such as those in several propositions  Counsel's decision not to object to the prosecutor's guilt or sentencing arguments represented a reasonable tactical choice, as did not objecting to the form of questions.  The prosecutor did not improperly lead witnesses.  Nor was the scope of redirect beyond that of the cross-examination.  Also, objections "'tend to disrupt the flow of a trial'" and "'are considered technical and bothersome'" by a jury.   *State v. Campbell,*  69 Ohio St.3d at 53, 630 N.E.2d at 352.  In sum, Hill has not rebutted the applicable "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."   *Strickland*, *supra,* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

**{¶ 81}** Nor has Hill demonstrated prejudice -- "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been

different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph three of the syllabus. The evidence of guilt was compelling; hence, his complaints about issues like question format are inconsequential.

## VIII

### *Cumulative error/Trial judge intervention*

{¶ 82} In his tenth proposition, Hill argues the cumulative effect of errors, especially prosecutorial misconduct, and his lack of effective counsel denied him a fair trial and just result. But his claims of error lack merit.

{¶ 83} "[T]here can be no such thing as an error-free, perfect trial, and *** the Constitution does not guarantee such a trial." *United States v. Hasting* (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106. Hill received a fair trial, few errors were found, and any error found did not prejudice his substantial rights. Such errors cannot become prejudicial by sheer weight of numbers. *State v. Davis* (1991), 62 Ohio St.3d 326, 348, 581 N.E.2d 1362, 1380.

{¶ 84} In his eleventh proposition, Hill generally complains about the plain-error rule and argues that trial judges should intervene more often to protect an accused from an ineffective counsel. However, we have recently reaffirmed the plain-error rule. *State v. Campbell*, 69 Ohio St.3d at 40-41, 630 N.E.2d at 344-345. Additionally, trial courts cannot interfere with counsel's trial tactics or representation of their clients. A trial court's authority to declare a mistrial *sua sponte* is limited. See *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900. Thus, we reject both Hill's tenth and eleventh propositions.

# IX

## *Settled Issues*

{¶ 85} Hill's remaining propositions of law raise settled issues of law. Prospective juror Marianne Lewis was properly excused for cause, and the trial court used the correct constitutional standard to death-qualify the jury. See *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841; *State v. Tyler*, 50 Ohio St.3d at 30, 553 N.E.2d at 586; *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. Hill failed to object at trial and preserve for review any issue relating to the jury verdict as a recommendation. (*e.g.* 1776) *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; Crim.R. 30(A). In fact, no error occurred. S*tate v. Woodard* (1993), 68 Ohio St.3d 70, 76-77, 623 N.E.2d 75, 80; *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 620 N.E.2d 50, 61. Hill is entitled to only six not twelve peremptory challenges. *State v. Mills*, 62 Ohio St.3d 357, 365, 582 N.E.2d 972, 981; *State v. Greer, at* paragraph two of the syllabus. Our system of proportionality review does not infringe the Constitution. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 176-177, 15 OBR 311, 322, 473 N.E.2d 264, 279; *State v. Sowell* (1988), 39 Ohio St.3d 322, 335, 530 N.E.2d 1294, 1308. Finally, we reject Hill's constitutional attack on Ohio's death penalty statue. *State v. Mills*, 62 Ohio St.3d at 371, 582 N.E.2d at 985; *State v. Sowell* at 336, 530 N.E.2d at 1309.

# X

## INDEPENDENT SENTENCE ASSESSMENT

{¶ 86} In his twenty-fourth proposition, Hill argues the prosecution failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed relevant mitigating factors; hence, he argues the death penalty is inappropriate. Our independent sentence reassessment resolves that issue.

{¶ 87} After independent assessment, we find the evidence clearly proves the aggravating circumstances for which Hill was convicted, *i.e.*, murder during a

25

kidnapping and aggravated burglary. As to possible mitigating factors, we find nothing in the nature and circumstances of the offense to be mitigating. Hill secretly kidnapped his daughter from her mother, while both slept. Then he brutally killed her, denied knowing where she was while neighbors searched, and later disposed of her body as though it were trash.

{¶ 88} Hill's history and background provide mitigating features. Admittedly, Hill had a difficult life growing up in an urban slum. His mother was depressed and poor, and he lacked a strong, supportive father. Relatives also described him as sweet, kind and gentle, and several family members clearly loved and cared for him. Yet, even his relatives, in effect, conceded that Hill never outgrew nor overcame the difficult challenges present in his youth. No evidence exists of a favorable work record; instead, Hill appears to have chosen to use and sell drugs to support himself. Although of average intelligence, he quit school after the eighth grade. He fathered a daughter, but evaded suggestions he support the child. In sum, we accord his history and background only modest weight. We find nothing in his character to be mitigating.

{¶ 89} As to the statutory mitigating factors, R.C. 2929.04(B)(1) through (6), only (B)(4), his youth, is applicable. Hill was born on June 7, 1971, and thus was fully nineteen on May 31, 1991, the date of the offense. Yet, at trial, the possibility was raised that he was born on June 7, 1972, making him not quite nineteen on May 31, 1991. However, even if only eighteen, Hill, with average intelligence, had been out of school for years, had been involved in gangs, and had fathered a child. Thus, he was mature enough to be fully accountable for his acts. Cf. *State v. Lorraine*, 66 Ohio St.3d at 429, 613 N.E.2d at 224; *State v. Slagle*, 65 Ohio St.3d at 613, 605 N.E.2d at 931.

{¶ 90} As to "other factors" as contemplated by R.C. 2929.04(B)(7), none appear to possess significant weight. Hill's vague expressions of remorse are not determinative. Rehabilitation does not appear likely. Cf. *State v. Fox*, 69 Ohio St.3d

183, 194-195, 631 N.E.2d 124, 133. Dr. Schmidtgoessling's testimony fails to establish any significant mental state entitled to mitigating weight. Admittedly, Hill underwent a psychiatric evaluation a few years previously and was then thought to suffer from mental problems. However, no evidence established that he suffered from any mental problems at the time of the offense. Similarly, in view of the evidence, we accord no weight to residual doubt.

{¶ 91} We find that the aggravating circumstances outweigh Hill's youth and the modest mitigating features of his history and background. Thus, we find the death penalty is appropriate. His victim was young, innocent, and helpless. As her father, he had a responsibility to nurture and protect her. Instead, by stealth and burglary, he kidnapped her from her mother, purposefully murdered her, and then callously disposed of her body. Although Hill came from a deprived background, he has demonstrated neither the desire nor effort to rise above the unfortunate circumstances of his birth despite family members who loved and assisted him.

{¶ 92} Imposing the death penalty in this case is appropriate and not excessive nor disproportionate when compared with the penalty in similar felony-murder cases of kidnapping. *State v. Joseph* (1995), 73 Ohio St.3d 450, 653 N.E.2d 285; *State v. Simko, supra*; *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; *State v. Fox*, *supra*; *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464; *State v. Brewer* (1990), 48 Ohio St.3d 50, 549 N.E.2d 491; and *State v. Morales*, *supra*. The death penalty is also proportionate and not excessive when compared with felony-murder cases involving burglary. *State v. Campbell*, *supra*; *State v. Franklin* (1991), 62 Ohio St.3d 118, 580 N.E.2d 1; *State v. Bonnell*, *supra*; and *State v. Landrum*, *supra*.

{¶ 93} Accordingly, we affirm the convictions and death penalty.

*Judgment affirmed.*

RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., CONCUR.

DOUGLAS and WRIGHT, JJ., concur in judgment only.