[Cite as *State v. Janson*, 2016-Ohio-5671.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**ASHTABULA COUNTY, OHIO**


STATE OF OHIO,                          :          **O P I N I O N**

        Plaintiff-Appellee,         :

    - vs -                              :          **CASE NO. 2015-A-0072**

JOSEPH RALPH JANSON,            :

        Defendant-Appellant.        :


Criminal Appeal from the Ashtabula County Court, Eastern District, Case No. 2015CRB00134E.

Judgment: Affirmed.


*Nicholas A. Iarocci, Ashtabula County Prosecutor*, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047-1092 (For Plaintiff-Appellee).

*Katherine S. Riedel*, Law Offices of Katherine S. Riedel Co., L.P.A., Jefferson Commercial Park, 1484 State Route 46 North, No. 5 Jefferson, OH 44047 (For Defendant-Appellant).


THOMAS R. WRIGHT, J.


{¶1} Appellant, Joseph Ralph Janson, seeks reversal of his criminal conviction for domestic violence, asserting that the verdict is against the manifest weight of the evidence. The conviction is affirmed.

{¶2} Appellant owns a home on Griggs Road in Jefferson, Ohio. As of April 8, 2015, he was residing there with his girlfriend, Sarah Perkins; his mother, Betty Janson;

a nephew; and a niece. Appellant was also allowing his brother's former wife, Jade Fulop, and her three children to live there on a fairly consistent basis. One of Fulop's children, appellant's niece A.J., was fourteen years old at the relevant time.

{¶3} Appellant and Perkins work the night shift at their respective jobs and therefore, neither of them were home on the morning in question. After waking up, A.J. told her mother that she was having trouble with her stomach. As a result, Fulop allowed A.J. to stay home from school. A.J. went back to sleep in an upstairs bedroom that she shares with one of the other children. A.J.'s bedroom is across the hall from appellant's bedroom.

{¶4} Appellant and Perkins are also volunteer firemen with a local department. On his way home from work that morning, appellant received a call for assistance from the fire department. After helping "clean-up" a motor vehicle accident, he and Perkins drove home together, arriving there before 1:00 p.m.

{¶5} Initially, appellant and Perkins drank coffee at their dining room table and chatted with Fulop. Appellant's mother, whose bedroom is on the home's first floor, also conversed momentarily. After about thirty minutes, Fulop left to go to a local convenient store for cigarettes. According to appellant, he and Perkins stayed downstairs until they saw Fulop pulling back into the driveway, at which time they went upstairs to go to bed and fell asleep without knowing that A.J. was in the home.

{¶6} According to Fulop, she never made it back to appellant's home. Instead, a short distance from the home, she saw A.J. running down the road with no shoes on, wearing only her pajamas and a T-shirt. Once A.J. got into Fulop's vehicle, Fulop noted that A.J. had blood on her face. When A.J. told her that appellant had struck her, Fulop

2

drove to a local truck stop and called the county sheriff's department. Fulop also photographed her daughter's face.

{¶7} A deputy interviewed A.J. at the truck stop and also took a photograph of her face. According to the deputy, the right side of A.J.'s bottom lip was swollen. After completing her statement to the deputy, A.J. signed a complaint against appellant. Other deputies were dispatched to appellant's home, where he was placed under arrest and charged with one count of domestic violence.

{¶8} A one-day bench trial was held in November 2015. A.J. testified that her mother woke her up to tell her she was going to the store. As she was falling back asleep, appellant entered her bedroom and asked why she was not in school. When she explained that she was ill, appellant yelled at her, saying that she was required to go to school so long as she lived in his house. When, in response, she was "a little lippy," appellant struck her across the face with an open hand. She immediately ran downstairs and fled.

{¶9} Fulop testified that the night after the incident, A.J.'s upper lip began to bleed again and the swelling increased. Fulop also testified that A.J. developed a bruise beside her lips a few days later. In conjunction with her testimony, the state introduced photographs Fulop took documenting the harm to A.J.'s face.

{¶10} Appellant testified on his own behalf, stating that he did not have a confrontation and that he did not see her the entire day. According to him, he went to sleep immediately after Fulop returned from the store and was unaware of any accusations until the deputies came to his residence. Perkins gave similar testimony, stating that she went upstairs the same time as appellant and did not see A.J. prior to

3

going to sleep. In addition, appellant's mother testified that she was on the first floor of the home the entire day, that she never heard any argument between her son and A.J., and that she did not hear anyone descend the steps and leave the home.

{¶11} At the conclusion of the evidence, the trial court found A.J.'s testimony, in combination with the photographs, to be more credible, and that the state proved beyond a reasonable doubt that appellant struck her with his hand. Accordingly, the court found him guilty of domestic violence and ordered him to pay a $200 fine.

{¶12} Appellant appeals, assigning the following as error:

{¶13} "The trial court erred to the prejudice of defendant-appellant in finding the defendant guilty of domestic violence when the verdict is against the manifest weight of the evidence."

{¶14} In asserting that the trial court erred in rejecting his version of the events, appellant focuses upon A.J.'s credibility contending that her version should not have been believed over his version because her testimony was uncorroborated. Appellant further emphasizes that his version of events was confirmed by his girlfriend and his mother.

{¶15} "In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997). 'Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to

4

support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶16} "Yet, granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio app.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 1996-Ohio-222, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, '[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe.' *State v. Dyke*, 7th Dist. No 99-CA-149, 2002-Ohio-1152." *State v. Pedro*, 7th Dist. Mahoning No. 11-MA-128, 2012-Ohio-3674, ¶11-12.

{¶17} Given the nature of the "witness credibility" determination, a conviction will not be reversed as against the manifest weight of the evidence "simply because the [trier of fact] believed one witness's testimony instead of another witness's testimony." *State v. Williams*, 10th Dist. Franklin No. 08AP-719, 2009-Ohio-3237, ¶17. In addition, "the testimony of any one witness as to any material fact, believed by the trier of fact, is sufficient to prove any such fact." *State v. Jones*, 2nd Dist. Clark No. 2005 CA 122,

2007-Ohio-2425, ¶24. *See, also, State v. Strong*, 10th Dist. Franklin No. 09AP-874, 2011-Ohio-1024, ¶42.

{¶18} The trial court, therefore, was not required to accept appellant's testimony merely because the testimony of two other witnesses supported his version in some respect. Instead, the court could justifiably predicate its verdict solely upon A.J.'s testimony provided it found her to be the most credible witness.

{¶19} A.J.'s testimony was consistent. Her version of the confrontation is not incredible. Moreover, her injury was corroborated by Fulop, the deputy, and photographs.

{¶20} As a separate challenge to A.J.'s credibility, appellant notes that her testimony conflicts with the deputy's regarding which lip was swollen. According to A.J., it was her top lip, while the deputy stated it was her bottom lip. Notwithstanding, appellant has not demonstrated that the trial court erred in believing A.J.'s testimony.

{¶21} A person is guilty of domestic violence if he knowingly causes physical harm to a family or household member. R.C. 2919.25(A). The trial court's verdict is supported and is not against the manifest weight of the evidence. Appellant's sole assignment of error lacks merit and the judgment of the Ashtabula County Court, Eastern District, is affirmed.

TIMOTHY P. CANNON, J., concurs,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

_____

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

**{¶22}** The present case is one of those extraordinary cases where the evidence weighs heavily against Janson's conviction for Domestic Violence. It is not a case where there are two conflicting versions of events, neither of which is unbelievable. *Supra* at ¶ 16. Rather, key aspects of the State's evidence are demonstrably false, such that Janson's guilt is not beyond reasonable doubt. Accordingly, I would reverse the conviction as being against the manifest weight of the evidence.

**{¶23}** Appellate courts reviewing manifest weight of the evidence challenges must conduct a review of the entire record, weigh the evidence and any reasonable inferences that can be drawn from it, and evaluate the credibility of witnesses, all of which allows the reviewing court to determine whether the jury clearly lost its way when it resolved conflicts in that evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In doing so, appellate courts should review, *inter alia*, the certainty and reliability of that evidence, whether the evidence is contradicted, the extent to which a witness may have an incentive to advance or defend his or her testimony, and the extent to which the evidence is vague, uncertain, conflicting, or fragmentary. *State v. Mattison*, 23 Ohio App.3d 10, 14, 490 N.E2d 926 (8th Dist.1985).

**{¶24}** Contrary to the majority's position, *supra* at ¶ 19, A.J.'s testimony regarding her injury is not corroborated by Deputy Daniels or the photographs. Both A.J. and Fulop (A.J.'s mother) testified that the inside of A.J.'s upper lip was "split open"/"busted" and bleeding.

**{¶25}** Three photographs were submitted into evidence purporting to show the damage to A.J.'s upper lip. Fulop testified that she took these photographs after she

7

and A.J. arrived at the truck stop, "about five minutes or so after it happened."

{¶26} When Deputy Daniels arrived at the truck stop, he also photographed A.J. However, in the photograph Deputy Daniels took, A.J. is wearing a different shirt than in one of the photographs taken by Fulop (State's Exhibit "C"). The difference between the photographs does not merely present conflicting testimony, but indicates that Fulop's photographs, and thus her testimony, are false.

{¶27} The differences between the photographs, in fact, corroborate the differences between A.J.'s/Fulop's and Deputy Daniels' testimony. A.J. and Fulop both claimed the injury was to her upper lip. Deputy Daniels testified that A.J. had a swollen bottom lip. A.J. and Fulop claimed that the lip was bruised and bleeding. Deputy Daniels testified there was neither bruising nor blood. When A.J. was shown Deputy Daniels' photograph, she agreed that it did not depict either bruising or bleeding.[1]

{¶28} Once it is established that certain aspects of the State's evidence are false, the evidence supporting Janson's version of events gains greater weight. A.J. testified that Janson was "yelling" at her and that she, in turn, "got lippy" and "a little louder." She testified that, after being struck, she ran out of the house from the second floor. Yet no one in the house heard any of this. Deputy Daniels testified that "there were quite a few family members in [Janson's] yard" after the incident, but none of them saw or heard anything.

{¶29} In light of the false or misleading photographs, the inherent improbability of A.J.'s version of events should be weighed against Janson's version.

{¶30} Janson testified that, after working all night, he arrived home in the

_____

1. Fulop offered the explanation that she told A.J. to leave the blood on her face because "the cops needed to get pictures," but A.J. would not listen and "kept wiping it off her face."

8

afternoon, and, after talking with Fulop and his girlfriend, went to bed without realizing A.J. was in the house. This testimony is corroborated by the testimony of Sarah Perkins (Janson's girlfriend) and Betty Janson (Janson's mother), neither of whom was aware that A.J. was at home that day. Fulop similarly testified that she spoke with Janson and Perkins for about a half of an hour after they returned home and before she left to buy cigarettes.

{¶31} According to A.J., she had been in bed all day with cramps. Fulop woke her up and told her she was going to buy cigarettes. Then, Janson came in her room and began yelling at her because she was not at school, insisting that it is his house, his rules, and that she "is not allowed to stay home from school." A.J. replied that if her mom says she can stay home, she can stay home. At this point, Janson slapped her in the face. A.J. ran out of the house and down the road.

{¶32} In the absence of any prior incidents between Janson and A.J., Janson's conduct as recounted by A.J. is random and incoherent. It is scarcely believable that Janson would slap A.J. because in his house children are not allowed to stay home from school.

{¶33} It is undisputed that a reviewing court must regard the determinations of the trier of fact with the greatest deference and respect. In the present case, however, the trier of fact failed to properly weigh the inconsistencies and improbability of the evidence against Janson. Accordingly, I respectfully dissent and would reverse the conviction.