DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of conviction and sentence entered by the Lucas County Court of Common Pleas after a jury found defendant-appellant, Mark Overton, guilty of one count of felonious assault. From that judgment, appellant now raises the following assignments of error:
"FIRST ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED IN GIVING AN ACQUITTAL FIRST INSTRUCTION.
"SECOND ASSIGNMENT OF ERROR
 TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO THE ACQUITTAL FIRST INSTRUCTION.
"THIRD ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED IN NOT GRANTING A MISTRIAL OR INDIVIDUAL VOIR DIRE AFTER PERMITTING THE JURORS TO LEAVE THE COURTROOM DURING A RECESS BY WALKING IN FRONT OF THE VICTIM'S CRYING WIFE."
On January 21, 1998, appellant was indicted and charged with one count of felonious assault in violation of R.C.2903.11(A)(2). The indictment resulted from the stabbing of Charles Pou on November 30, 1997 at the LaGarza dance club in Toledo, Ohio. The case proceeded to a jury trial on September 23, 1998, at which the following testimony was elicited.
In the fall of 1997, Charles Pou was employed as a bouncer at LaGarza's. As a bouncer it was Pou's job to maintain peace and order in the club and to insure that no illegal activities were going on in the club. In addition, LaGarza's had a policy that customers were not permitted to wear hats in the club because of the gang affiliations that they represented. It was Pou's job to enforce that policy. At approximately 2:30 a.m. on November 30, 1997, Pou confronted a customer in LaGarza's who was wearing a red hat. Pou asked the customer to remove his hat several times but the customer refused. Pou then, with the help of other bouncers, forcibly removed the customer from the club. Pou subsequently learned that the customer was Felix Wyse. Pou testified that his removal of Wyse from the club sparked chaos and other fights in the club during which mace was sprayed. During the chaos, Pou turned around and found himself facing appellant Mark Overton. Pou testified that Overton then hit him in the arm twice with a thrusting motion and then hit him in the chest with the same motion. At that point, Pou realized that Overton was actually stabbing him. Others then joined in the fight, pushing Pou against a wall. During that fight, Pou was stabbed twice more. Pou's wife, Yaeunda Pou, who was at the club with friends, jumped into the fray and attempted to pull the assailants off of her husband. Eventually, the group ceased their attack and left the club. Pou then sat down and realized that he was drenched in blood. Pou and his wife exited the building and, fearing that an ambulance would not arrive in time, went to their own car so that Pou's wife could drive him to the hospital. Prior to their leaving, a police officer brought Felix Wyse to them and asked if he was the assailant. Pou responded that he was not, and then left for the hospital. At the hospital, Pou learned that he had been stabbed five times. While in the hospital, Pou was interviewed by Detective Ann Smith but he was not able to give her the name of his assailant. Subsequently, however, after he was released from the hospital, Detective Smith came to his home and showed him a photo array that included a picture of appellant. Pou immediately identified appellant as the person who stabbed him. In addition, in the trial below, appellant identified appellant as his assailant.
Yaeunda Pou also testified at the trial below. She stated that on the night of the attack she was at LaGarza's celebrating her birthday with some friends when she noticed her husband and some other bouncers escorting a customer out of the club. Several minutes later, Yaeunda saw her husband in an altercation with appellant, whom she knew from elementary school. Yaeunda first saw appellant reaching out his hand toward Charles and jumping at him and then saw several other men join in the fight to help appellant. Yaeunda then decided to jump on the men to try to help her husband. The crowd then broke up and Yaeunda, realizing that her husband had been stabbed, helped escort him out of the building. After Yaeunda and Charles got to their car but before they could leave, a police officer brought a man in a red baseball hat over to them and asked if he was the person who stabbed Charles. Yaeunda responded that he was not. She then drove Charles to the hospital. While at the hospital, Yaeunda was interviewed by police officers. She told the officers that she could identify the assailant and that his name was either Mark or Gary Overton. She also gave them a description of the assailant. Mrs. Pou testified that several days later, Detective Ann Smith came to the Pou home and showed her a photo array. Mrs. Pou stated that upon seeing the photo array she immediately picked out appellant's picture.
In addition to the Pous, Robert Smith, a bouncer at LaGarza's, Detective Ann Smith, and Officer Raynard Cooper testified on behalf of the state. Robert Smith confirmed that on the night at issue, numerous fights had broken out in LaGarza's around the time that Charles Pou escorted a customer out of the club for wearing a hat. He further testified that before entering the club, all male customers are patted down for weapons and all female customers scanned by a metal detector wand. Despite these efforts, Smith stated that on numerous occasions, customers inside the club have been found to possess weapons.
Detective Ann Smith was an investigating officer in this case. In the early morning of November 30, 1997, Detective Smith arrived at the Toledo Hospital to investigate the assault on Charles Pou. She spoke to Mr. Pou in the intensive care unit where he gave her a description of the assailant and told her that his last name was Overton. Subsequently, Detective Smith spoke with Yaeunda Pou on the telephone who stated that Charles had been stabbed by Mark Overton. Based on her conversations with the Pous, Detective Smith compiled a photo array which she brought to the Pous' home several days later. Detective Smith then separated the Pous and independently showed them the photo array. They both identified appellant as the assailant. Detective Smith further testified that although she had been given the names of both Mark and Gary Overton, she eliminated Gary Overton from the photo array because he did not fit the physical description of the assailant given by the Pous. She further testified that neither Charles nor Yaeunda Pou ever indicated that there was more than one principal assailant.
Officer Raynard Cooper was working as an off-duty patrolman at LaGarza's on the night of the assault. He and five other off-duty officers were hired to patrol the exterior of the club but did not provide any interior security. Cooper testified that at some point during the night, people started exiting the club coughing and saying that someone was spraying mace inside. During this commotion, Cooper saw appellant exit the club. Cooper stated, however, that appellant did not have any blood on him. Subsequently, Cooper learned that Mr. Pou had been stabbed. While outside the club, Cooper and another off-duty officer, Officer Daniels, heard someone identify Felix Wyse as the assailant. Cooper and Daniels then grabbed Wyse and took him to Mr. Pou, who was then at his car. The Pous, however, stated that he was not the assailant. Cooper further testified that during the commotion, while others were trying to exit the club, Wyse was outside of the club trying to get back in.
At the conclusion of the state's case, appellant made a motion for an acquittal, which the trial court denied. Appellant then called four witnesses to testify on his behalf. Officer Byron Daniels, an off-duty officer handling security in the parking area, testified that during the commotion of people fleeing the club, he came in contact with Mr. Pou who was, at that time, bleeding and quite disoriented. When Daniels asked him who stabbed him, Pou pointed to a man down the block wearing a red hat and said "there he goes." Daniels immediately grabbed the man, later determined to be Felix Wyse, and brought him to Pou. Daniels testified that Pou was then unsure if Wyse was his assailant. He further testified that Mrs. Pou stated that Wyse may have been with the group that attacked her husband. Daniels stated, however, that they did not arrest Wyse because a bouncer indicated that he had been outside the club during the attack. Finally, Daniels testified that during his entire conversation with the Pous, Mrs. Pou never identified appellant as the assailant.
Appellant next called Patrolman Mark Johnson, who was dispatched to the club on the night of the stabbing, to testify. Johnson stated that after helping to disburse the crowd at LaGarza's, he went to the hospital where he spoke with Mrs. Pou. Johnson testified that during that conversation, Mrs. Pou gave him the name of Gary Overton as a suspect but stated that two men had jumped her husband and she did not know who stabbed him.
Finally, appellant called LaTisha Glover and Shavonie Lucas, who were both at LaGarza's on the night of the stabbing, to testify on his behalf. Glover was at the club that night with a group of friends that included appellant. Glover testified that at some point she saw Felix Wyse and Mr. Pou fighting, after which Wyse left the club. Approximately ten minutes later, another fight broke out between two girls, one of whom then sprayed mace. Glover stated that after the mace was sprayed, the crowd went crazy and everyone was pushing each other and rushing to get out of the club. At that time, appellant was on the stage with Glover when they heard someone yell "Gary is fighting." "Gary" is Gary Overton, appellant's nephew. Appellant then left the stage and pulled Gary out of a fight. Glover, however, could not say who Gary was fighting. She also could not say how long appellant was on the stage before he left to break up the fight. Shavonie Lucas is Glover's cousin and the mother of appellant's two children. She too testified regarding the events in question; however, she stated that she specifically saw Gary fighting the same man who Felix Wyse had fought earlier. Lucas then stated that after appellant pulled Gary away, appellant pushed the man who they were fighting, Mr. Pou, into a wall. Mr. Pou then stumbled away and got into another fight. After that fight, Mr. Pou stumbled into Lucas and got blood on her. Lucas stated that she never saw appellant with a knife that evening and never saw appellant stab Mr. Pou. On cross-examination, Lucas admitted that appellant and Gary Overton do not look similar in appearance.
After appellant presented his case, the court charged the jury on felonious assault and the lesser included offense of assault. In addition, the court instructed the jury as follows:
 "If you find the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of felonious assault then of course your verdict must be not guilty.
 "If you find that the State proved beyond a reasonable doubt all of the essential elements of the offense of felonious assault then your verdict must be guilty. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of felonious assault as I said your verdict must be guilty — not guilty of that offense, then in that event you will continue your deliberations and decide whether the State has proved beyond a reasonable doubt all of the essential elements of the lesser included offense of assault."
Subsequently, the jury found appellant guilty of felonious assault in violation of R.C. 2903.11(A)(2). On November 9, 1998, the court entered a judgment of conviction and sentenced appellant to a term of six years incarceration. It is from that judgment that appellant now appeals.
Because they are interrelated, we will address the first and second assignments of error together. In his first assignment of error, appellant challenges the trial court's instruction quoted above regarding the jury's consideration of the lesser included offense of assault. Specifically, appellant contends that the court erred in giving an impermissible "acquittal first" instruction in its charge to the jury. In his second assignment of error, appellant asserts that his trial counsel was ineffective for failing to object to this erroneous instruction.
Failure to object to an error in the trial court in a criminal proceeding precludes the issue from being raised on appeal, unless the issue rises to the level of plain error. Statev. Underwood (1983), 3 Ohio St.3d 12, 13; State v. Long (1978),53 Ohio St.2d 91. Plain error is an obvious error or defect in the trial court proceedings, affecting substantial rights, where, "but for the error, the outcome of the trial clearly would have been otherwise." Underwood, supra, at syllabus; Long, supra, at paragraph two of the syllabus; see, also, Crim.R. 52(B).
In the present case, appellant's counsel failed to object to the instruction quoted above. Accordingly, appellant is precluded from raising this issue on appeal except under the doctrine of plain error.
In State v. Thomas (1988), 40 Ohio St.3d 213, paragraph three of the syllabus, certiorari denied (1988), 493 U.S. 826, the Supreme Court of Ohio held:
 "A jury must unanimously agree that the defendant is guilty of a particular criminal offense before returning a verdict of guilty on that offense. If a jury is unable to agree unanimously that a defendant is guilty of a particular offense, it may proceed to consider a lesser included offense upon which evidence has been presented. The jury is not required to determine unanimously that the defendant is not guilty of the crime charged before it may consider a lesser included offense."
In making this determination, the court held that trial courts could not use "acquittal first" instructions before instructing a jury on a lesser included offense. The court, however, then approved the following instruction:
 "`If you find that The State has proven beyond a reasonable doubt all of the essential elements of the crime of aggravated murder, then you verdict must be that the Defendant is guilty of aggravated murder; and you will not consider the lesser offense.
 "`However, if you find that The State has failed to prove beyond a reasonable doubt the element of prior calculation and design, then your verdict must be that the Defendant is not guilty of aggravated murder.
 "`You will then proceed with your deliberations and decide whether The State has proven beyond a reasonable doubt all of the essential elements of the lesser crime of murder.'" Id. at 220.
In approving this instruction, the court concluded that the instruction had "negligible coercive potential" because it did not "expressly require unanimous acquittal on the charged crime, but rather address[ed] possible disagreement by the jury on the element of prior calculation and design and a corresponding inability to reach a verdict of guilty of aggravated murder." Id.
In our view, the instruction in the present case, as inThomas, "speaks to the jury's inability to find, whether unanimously or not, a certain element of the greater offense." Id.
at 220. Moreover, we approved of a similar instruction in Statev. Tucker (Dec. 1, 1995), Erie App. No. E-94-047, unreported, and the Eighth District Court of Appeals has approved a nearly identical instruction in State v. Rainge (Jan. 16, 1992), Cuyahoga App. No. 59710, unreported. Appellant appears to argue that the court's addressing the jury in the collective removes from the individual jurors the ability to disagree on any one element of the greater offense before considering the lesser offense. Although the court in Thomas did stress that "a better instruction would be to incorporate the `inability to agree' language" that the court adopted in that opinion, it further found that the failure to use such language did not amount to prejudicial error. Accordingly, we reject appellant's argument.
The trial court did not err in instructing the jury as it did and the first assignment of error is not well-taken. Finding that the instruction was not erroneous, we further cannot conclude that appellant's trial counsel was ineffective for failing to object to it and the second assignment of error is also not well-taken.
In his third assignment of error, appellant asserts that the trial court erred in failing to grant a mistrial or in failing to individually voir dire the jurors after they were exposed to an emotional outburst by Mrs. Pou.
The event to which appellant refers occurred during appellant's trial counsel's cross-examination of Mrs. Pou. When Mrs. Pou became upset in explaining her husband's injuries and her belief that he was dying, the parties agreed to take a recess. During that recess, appellant's trial counsel moved as follows:
 "MR. WINGATE: Your Honor, I will indicate for the record that due to the emotional outburst by the witness's wife of the victim [sic], and the way the outburst took place — the emotional outburst took place, and the fact that even as we took a recess that the witness, Mrs. Pou, was actually standing in a position whereby the jurors had to singly — single file pass by her on the way to the jury room, I believe that that —
 "THE COURT: Are you suggesting that she was speaking to the jurors?
 "MR. WINGATE: No, I'm not saying she was speaking to the jurors. Even though she may have not been speaking to the jurors there were words exchanged between her and some female person in the audience that was comforting her. I believe that that picture is embedded in the jurors' minds.
 "I know this is [sic] case is to be based upon the lack of any bias, sympathy, whatsoever, but I do believe this poses such a sympathetic and dramatic mixture in the mind of jurors that cannot be imposed, and as much as there is a question of the identity of the person of this offense we believe the sympathy coupled with the outburst as it took place that this stigma cannot be removed and thus has tainted this jury and prevented them at this point from being fair and impartial to the point that I would request a mistrial."
The court denied appellant's motion but then asked if he wanted a cautionary instruction given to the jury. Appellant's counsel responded that he would rather have the jury members individually voir dired. The court indicated that it would not individually voir dire the jurors but would give a cautionary instruction. Appellant's counsel agreed but renewed his objection to the denial of his motion for a mistrial. The court then instructed the jurors as follows:
 "Ladies and gentlemen, when you were sworn as jurors and during the voir dire you recall that I said to you and your oath contained a promise that you would make your decision based on the law the Court gives you, do you remember that? And that you would not change the law nor apply your own notions of what you think the law should be. Do you understand that?
 "Now, the law is this: Sympathy is a very common human emotion. However, jurors may not consider sympathy in making their decisions in reaching a verdict in a case. Your decision in your verdict must be reached solely from the facts and the testimony adduced and the evidence adduced at trial in this case. You understand that? Okay. Thank you. Now, anything further, gentlemen?
"MR. WINGATE: Nothing further."
In addition to this cautionary instruction, the court, in its final charge to the jury instructed them to make their findings without bias, sympathy or prejudice.
Appellant contends that the cautionary instruction given above was insufficient and that the court should have granted a mistrial or individually voir dired the jurors to determine whether they were influenced by the outburst. The Supreme Court of Ohio has consistently held that: "[t]he impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record. `Was the jury disturbed, alarmed, shocked or deeply moved? * * * These questions necessarily depend on facts which no record can reflect.'" State v. Hill
(1996), 75 Ohio St.3d 195, 204, quoting State v. Bradley (1965),3 Ohio St.2d 38, 40. Accordingly, a trial judge is in the best position to determine whether a defendant's right to a fair trial was compromised or whether a voir dire of the jury is necessary.State v. Bey (1999), 85 Ohio St.3d 487, 500. As such, a trial court's determination regarding whether a mistrial or voir dire is warranted will not be disturbed on appeal "`* * * in the absence of evidence contrary to that determination clearly and affirmatively appearing on the face of the record.'" State v. Morales (1987),32 Ohio St.3d 252, 255, quoting State v. Bradley, supra, the syllabus.
In the present case, the court determined that the best way to deal with the situation at hand was to give a cautionary instruction. Nothing in the record before us leads us to believe that this was in any way insufficient. Accordingly, we cannot find that the trial court abused its discretion in denying the motion for mistrial or in failing to individually voir dire the jurors. The third assignment of error is not well-taken.
On consideration whereof, the court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Melvin L. Resnick, J., Richard W. Knepper, P.J., Mark L. Pietrykowski, J., CONCUR.