OPINION
Andrew Turner appeals the Montgomery County Court of Common Pleas' judgment entry convicting him of involuntary manslaughter in violation of R.C. 2903.04(A).
Turner was indicted on October 28, 1997 on one count of involuntary manslaughter, in violation of R.C. 2903.04(A). A jury trial was held on September 7, 1999. The trial testimony is summarized as follows.
Turner met Sara Moore on June 3, 1996, just three days before her graduation from high school. The couple began dating, and in October of 1996, Moore discovered that she was pregnant. In March of 1997, the couple moved into a third floor apartment at 3248 Gracemore in Kettering, Ohio. Eric Michael Turner was born to the couple on May 23, 1997.
Sara Ann Hussong, who had been a good friend of Moore's, testified that Moore had been "estatically {sic} happy" about having Eric. She stated Moore had been "great" with Eric, acting as if "she'd been raising kids all her life." Hussong visited with Moore almost every day, and Hussong had witnessed Moore around Eric while he had been fussy and crying. Hussong stated that during those times Moore had been gentle with Eric, and had been very concerned and had tried to calm Eric. Additionally, Hussong had worked with Moore during high school at Wenzler Daycare, and Hussong stated that the employees and the parents at the daycare had been very pleased with Moore.
On the Friday of Labor Day weekend, August 29, 1997, Moore attended a high school football game with Kathleen Oliver and Hussong while Turner remained at home with Eric. Hussong and Oliver both testified that this was only Moore's fourth time away from Eric since his birth, and Moore had been scared to leave him that night because he was so young. At the game, the women encountered Hussong's friends including Elijah Baker, Scott Spaeth, James Magnon, and Josh Miller. After the game the group proceeded to Spaeth's house, where Moore and Baker spent several hours talking to each other. Baker testified that he had asked Moore that night if she had a boyfriend, and she had replied "not really." She told him about her situation and that she was planning to move herself and Eric to her parents' home.
At approximately 1 a.m., everyone except Baker and Newman went to Denny's restaurant. While there, Turner paged Hussong, and Moore returned his call. Fifteen minutes later, Hussong drove Oliver and Moore home. The three made plans to go to the Alter Fun Fest the following day.
On Saturday morning, August 30, 1997, Hussong visited with Moore. Moore mentioned to Hussong that she wanted to move out of the apartment, but she was "fearful" of losing Eric if she left. According to Hussong, Moore had spoken about moving from her apartment even before Eric was born. Later that evening, Turner remained at the apartment with Eric while Moore, Oliver and Hussong proceeded to the Alter Fun Fest. After the festival, the women went to a party at Laura and Holly Snapp's home, where they encountered Baker and some of the other men from the night before. According to Hussong and Oliver, during the course of the evening Moore had spoken about moving from the apartment the following day, although no formal plans were made.
Oliver and Hussong left the party at approximately 1 a.m. Moore proceeded with Baker and the others to another party at Carrie Doyle's home. Baker and Spaeth testified that they sat on the balcony with Moore, and she had spoken with them about moving out of her apartment. Although no formal plans were made, both men were left with the impression that Moore would call Baker on Sunday, August 31, 1997, for help with moving her out of the apartment that day.
At approximately 2 a.m., Hussong's friends drove Moore home. Baker, Miller and Moore exited the car, and Moore gave Baker a kiss on the cheek and hugged both men. Magnon and Miller testified that as Moore had entered the building, they had heard a noise coming from the vicinity of Moore's third floor apartment that sounded like a door being shut or slammed.
At approximately 9 a.m. on Sunday, August 31, 1997, Turner's parents, Lynn and Tim Turner, received an unexpected visit from Turner and Eric in their Springfield, Ohio home. Lynn Turner testified that she had asked Turner if Moore was with them, to which Turner said "no." Lynn Turner then asked if Moore was at home, to which Turner responded "yes." Turner prepared Eric's bottle, changed him and fed him. He sat down and watched Sunday Sports Reporter on ESPN. Just after 11:30 a.m., Lynn Turner offered to fix Turner a sandwich. As she went into the kitchen, Turner followed her and stated that he needed to talk to her. Turner stated to his mother "I think Sara is dead. * * *I think I killed her." Lynn Turner began screaming "Oh, God, oh, God," and Turner said "I think I choked her," indicating with his hands. Tim Turner ran into the kitchen and heard Turner's exclamation. Turner explained that he had come to their house to bring Eric to them, and so that they could turn him into the police.
Lynn Turner called Moore's mother, Sheila Moore, who lived close to the Kettering apartment. Trying to remain calm, Lynn Turner told Sheila Moore that Turner and Moore had had an argument, and for her to meet them at the apartment. Shortly thereafter, Lynn Turner called Sheila Moore a second time to tell her that Moore might have been badly hurt and that it would be best to go to the apartment as soon as possible. Sheila Moore left immediately. Upon arriving at the apartment, Sheila Moore knocked on the door loudly, and called for Moore, but the door remained locked and no one responded. Thereafter, Tim and Lynn Turner arrived at the apartment with a key. Turner remained in the van with Eric.At the apartment, Tim Turner unlocked the door and entered before the women. They searched the small apartment until Tim Turner found Moore in the bathtub, clad only in a wet maroon t-shirt. Sheila Moore and Tim Turner lifted Moore from the tub and into the hallway to perform CPR. They stated that Moore's neck and face were purplish. Sheila Moore also stated that she could not detect a pulse, and that Moore's jaws were"locked tight" so that she could not "get any air in" while trying to resuscitate Moore. During this time, Lynn Turner called 911, stating that Turner had choked Moore during an argument.
Kettering Firemen/Paramedics Stanley L. Irvin and Michael J. Grunkenmeyer were dispatched shortly before 1 p.m. to the apartment for a possible "nonbreather." Based upon the finding of rigor mortis already present in Moore, they quickly terminated their efforts to resuscitate. Grunkenmeyer placed a sheet over Moore's body. Irvin testified that he had noticed bruising around Moore's neck. Kettering Patrolmen Roger T. Smart and Michael Mannix were also dispatched to the scene and they arrested Turner.
Turner testified on his own behalf. He stated that on Thursday, August 28, 1997, he and Sheila Moore had taken Eric to Miami Valley Hospital, Sheila Moore's place of employment, because Eric would not stop crying and he would not eat. Turner stated that a doctor had evaluated Eric and had given him prescription medication, although Turner could not recall what the problem had been ("teething or something like that") or the name of the prescription. On Friday night, August 29, 1997, Turner watched Eric while Moore went to the football game with her friends. Turner stated that Eric had "sleeping problems" that evening and had awakened three or four times crying inconsolably. Turner had paged Hussong to reach Moore and tell her that he needed help calming Eric. By the time that Moore arrived home, Eric and he were asleep.
Turner testified that on Saturday, August 30, 1997, he, Moore and Eric had attended the Alter Fun Fest from 7 to 9:30 p.m. When they arrived home, Moore left without telling him where she was going. Turner stated that during the time she was gone, Eric had cried inconsolably and would not eat. Turner stated that he had not given any medication to Eric because he had not known how much to give him. He also did not call Sheila Moore or his parents for help.
At approximately 4 a.m., Turner awakened when he heard Moore enter the nursery. Turner followed Moore into the nursery to tell her that Eric had cried and to ask about the medication. According to Turner, Moore began "yelling" about not being able to "go out" without being "interrupted" by him. Turner stated that he had been surprised, because they had never yelled at one another. Although Moore's screaming did not awaken Eric, the couple proceeded out to the balcony, where Moore again began screaming and yelling at Turner. Eventually, Moore calmed down and slept on the couch in the living room.
At approximately 7 a.m., Turner heard Moore walk into the nursery. As Turner entered the nursery, he could see Moore cradling Eric, who was crying. At that point, Moore told Turner that she was "sick" of him and Eric, and she shook Eric. Upon Turner's urging, Moore "tossed" Eric to him and "busted out" of the room. Turner began to cry. Eric would not stop crying, so Turner placed him back into his crib and he proceeded to the kitchen to get a bottle for Eric. Upon cross-examination, Turner stated that he did not bring Eric to the kitchen with him to make the bottle because he had not wanted "to walk past her." He could hear Moore in the bathroom, running water for a bath. In the kitchen, Turner heard Moore "stomping" around, and he immediately "dropped everything" and went back into the nursery, fearing what Moore might do to Eric. As he walked into the nursery, he saw Moore pick up Eric and shake him again. Moore stated that she was "sick of the both of [them]," tossed Eric into Turner, and left the room.
As Turner changed Eric's diaper, he could hear Moore "slamming some stuff around," and "ranting and raving." Moore came running back toward the nursery. Turner had placed Eric into the crib and he stood in the center of the room. Moore headed straight for the crib and Turner recalled moving toward Moore. From that point on, however, Turner could not recall anything until the point he emerged from the bathroom. He recalled walking into the nursery, picking up Eric, and walking by the bathroom again on his way into the kitchen to finish making Eric's bottle. He remembered seeing Moore, face up in the tub, with her head "above the water." He stated that he did not say anything to Moore, because he "thought she was dead." He then fed Eric, and Eric finally stopped crying. Turner left Eric in his seat in the living room while he put a towel over Moore's body and her head, and covered up some of the feces in the bedroom and on the bed, stating that he did this because he "didn't want Eric to see that."
Turner proceeded to his bedroom to change, then he changed Eric. Turner then drove to his parents' place in Springfield with the intent of handing over Eric and turning himself into the police. At no point did he call 911 for assistance.
In corroboration of Turner's defense, Lynn and Tim Turner both testified on cross-examination that they had been aware that Moore might have been rough with the baby, but they had not sought any assistance. Lynn Turner stated that on Saturday, August 30th, Turner had expressed his concern and fear that Moore had shaken Eric two or three times. Although Lynn Turner had never seen Moore shake Eric, she recommended that Turner seek help. Tim Turner testified that he had once witnessed Moore shake Eric, but that he had never told anyone because he had felt it had been an isolated incident.
After Turner was arrested, Eric was handed over to Sheila Moore and they were escorted by Kettering Patrolman Gerald L. Geisel to Children's Medical Center ("CMC") to have Eric evaluated. Both Ptl. Geisel and Sheila Moore testified that during the two-hour excursion to CMC, Eric slept a bit but was well-behaved and awake for most of the trip.
Doctor Raul Chabali testified that he had examined Eric at the CMC emergency room on August 31, 1997, and found no evidence of trauma or abuse. Dr. Chabali opined that Eric had not been subjected to violent shaking, although he could not rule out the possibility that a milder shaking episode did occur that would have left behind no physical signs or symptoms. Additionally, Dr. Chabali stated that Eric appeared "healthy, happy, well-nourished" and that "[h]e was a pretty good-natured baby" with no periods of "pronounced crying or screaming."
Montgomery County Deputy Coroner David M. Smith testified regarding the autopsy he had performed on Moore. He stated that Moore, who had been five foot, three inches tall, and had weighed ninety-four pounds, had died from violent manual strangulation and drowning. He found several separate areas of bruising and abrasions on Moore's neck, with some linear markings from the necklaces on her neck. Deputy Coroner Smith noted that Moore had numerous red spots called petechiae on her face and neck, where small blood vessels had broken, a sign of strangulation. Internally, Moore had a "rather large area" of bleeding in the soft tissues of the jaw, signifying the physical trauma of vigorous manual strangulation, and indicative that Moore had been alive at the time of the injury to the area. Other injuries in Moore's neck included an area of bleeding behind the esophagus and in front of the spine, between the thyroid bone, and around the voice box.
Deputy Coroner Smith also observed foamy pulmonary edema coming from Moore's nostrils. Her lungs were hyper-extended and expanded, and her skin exhibited the immergence effects of a "wrinkled washer woman." Based upon these findings, he determined that Moore had been drowned. Additionally, Forensic toxicologist Roy K. Smith testified that he had found no drugs or poisons in Moore's body.
Detective Michael P. Pooler testified about a crime sketch he had created. Det. Pooler stated that there were "heavy chunks" of fecal matter on the floor near the bed in the master bedroom. Det. Pooler stated that the mattress cover in the master bedroom had been pulled almost completely off the bed and was hanging by one corner, indicating a struggle. Inside the mattress cover was "a large smear of feces." Remaining in the middle of the bed were a pair of lady's underwear and a pair of boxers, both later determined to be Moore's, each with a "thick smear" of feces in the crotch area. Det. Pooler discovered more feces smeared in several sections of the bathtub where Moore was found, and there was no water in the bathtub.
The jury returned a guilty verdict on September 13, 1999 for the charge of involuntary manslaughter as the proximate result of having committed a felonious assault. On October 19, 1999, the trial court sentenced Turner to the maximum penalty of ten years incarceration. Turner now appeals his conviction, asserting one assignment of error:
 The trial court committed prejudicial error, in violation of the due process clause of the United States Constitution, when it failed to instruct on the lesser included offense of involuntary manslaughter due to the commission of a misdemeanor[.]
Turner argues error in the trial court's failure to instruct the jury on the lesser included offense of involuntary manslaughter as the proximate result of having committed a misdemeanor assault. He argues that there was evidence from which the jury reasonably could have rejected the charge of involuntary manslaughter as the proximate cause of a felonious assault, and found Turner guilty of the lesser included offense. In particular, Turner argues that based upon his inability to recall the events relating to Moore's death, the jury could have easily rejected the theory that he had intended to inflict serious physical harm on Moore. We disagree.
It is important to note that trial counsel failed to object to the jury instructions at trial. As a result of his failure to object, Turner has waived all but plain error. See State v. Bey
(1999), 85 Ohio St.3d 487, 497. Plain error does not exist unless, but for the error, the outcome at trial would clearly have been different. State v. Moreland (1990), 50 Ohio St.3d 58, 62. Under the plain error standard, even if the trial court should have given an instruction on a lesser included offense, a defendant must demonstrate that but for the trial court's error, the outcome of the trial would have been different. State v.Beasley (June 1, 1998), Stark App. No. 1997CA00423, unreported. Plain error should be applied with caution and only in exceptional circumstances. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus, 7 Ohio Op.3d 178, syllabus.
Under R.C. 2945.74 and Crim.R. 31(C), a fact finder may consider lesser included offenses of a charged offense and may find a defendant guilty of a lesser included offense if the facts support such a result. See, also, State v. Deem (1988), 40 Ohio St.3d 205,209.
In Deem, a three-prong test was developed to determine whether an offense is a lesser included offense of another:
An offense may be a lesser included offense of another if
(i) the offense carries a lesser penalty than the other;
 (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense.
 Id., paragraph three of the syllabus.
Turner was charged with involuntary manslaughter under R.C.2903.04(B), which states that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." The underlying felony which Turner committed was felonious assault under R.C. 2903.11(A)(1), which states that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." If Turner had been charged on the lesser included offense, the underlying misdemeanor would have been assault under R.C. 2903.13, which states that "[n]o person shall knowingly cause or attempt to cause physical harm to another[.]"
Under the Deem standard, assault is a lesser included offense of felonious assault. Furthermore, as the court stated in Statev. Shirk (Nov. 4, 1997), Franklin App. No. 97APA03-390, unreported,
 [i]nvoluntary manslaughter, under R.C. 2903.04(B), carries a lesser penalty than involuntary manslaughter under R.C. 2903.04(A); involuntary manslaughter, under R.C. 2903.04(A), cannot ever be committed without the offense of involuntary manslaughter under R.C. 2903.04(B) also being committed; and an element of involuntary manslaughter, under R.C. 2903.04(A), is not required to prove the commission of involuntary manslaughter under R.C. 2903.04(B). Thus, involuntary manslaughter under R.C. 2903.04(B) is a lesser included offense of involuntary manslaughter under R.C. 2903.04(A) [.]
There is not an automatic entitlement to an instruction on a lesser included offense. Instead, "a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."State v. Thomas (1988), 40 Ohio St.3d 213, paragraph two of the syllabus, citing State v. Davis (1983), 6 Ohio St.3d 91 andState v. Wilkins (1980), 64 Ohio St.2d 382, 18 Ohio Op.3d 528. See, also State v. Weaver (July 16, 1999), Champaign App. No. 98-CA-32, unreported.
Turner argues that the evidence at trial would reasonably support the jury's rejection of the notion that he had intended
the serious physical harm to Moore. However, according to statute, a person acts "knowingly" when he proceeds, aware that his conduct "will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). The State did not have to prove that Turner intended to cause serious physical harm to Moore, only that he knew his conduct probably would have resulted in serious physical harm to her.
Based upon the evidence put forth at trial in this case, we find that the jury could not have reasonably acquitted Turner of involuntary manslaughter under R.C. 2903.04(A) while finding him guilty of involuntary manslaughter under R.C. 2903.04(B). Turner claimed that the altercation began in the nursery, not in the master bedroom, and that during this time Moore had been running water for a bath. However, feces, or any other indication of a struggle, were not found in the nursery, but all over the bed and other parts of the bedroom, the hallway leading to the bathroom, and in the bathroom. Incidentally, there were feces smeared on the inside of the bathtub, which would contradict Turner's recollection that Moore had already begun running the water for a bath prior to the altercation.
The record also reveals that Turner assaulted Moore with such a magnitude of force that, according to Dr. Smith, it qualified as a "vigorous strangulation" and one that produced extensive internal and external physical injuries. The point contact injuries experienced by Moore were the result of "tremendous pressure." Furthermore, at some point after or during the strangulation, Turner had drowned Moore. Both the acts of strangulation and drowning Moore were actions that Turner should have known would have "probably" resulted in serious physical injury to Moore.
Turner's actions after the strangulation and drowning further support the jury's verdict of involuntary manslaughter based upon felonious assault. After the strangulation and drowning, Turner made no attempt to seek help for Moore. Instead, he left Moore in the bathtub, drained the water, covered Moore's face and body with a towel, fed and changed Eric, and changed his own clothes. He then drove to Springfield and "visited" with his parents for more than two hours, during which he played with Eric and watched ESPN with his father. During this time he did not call 911 and he did not tell anyone of Moore's condition in an attempt to obtain help. In fact, it was almost three hours before Turner alerted his parents to Moore's "condition," demonstrating further that Turner intended to cause serious physical harm to Moore. Had there been a chance to resuscitate Moore, Turner had to have been aware that his inaction for three hours would result in at least serious physical harm. Based upon the severity of Moore's injuries and Turner's failure to get help, we find that no reasonable jury could have concluded that Turner had intended to cause Moore anything but serious physical harm.
Furthermore, in support of his plain error theory, Turner argues that counsel's failure to request the lesser included offense instruction on these facts cannot be chalked up to trial tactics. A strong presumption exists that defense counsel's failure to request a lesser included offense instruction is a matter of trial tactics. State v. Harris (1998), 129 Ohio App.3d 527,533. Stated another way, tactical decisions do not constitute plain error. State v. Hill (1996), 75 Ohio St.3d 195. However, Turner's affirmative defense was that he had to use deadly force to protect Eric from imminent danger of great bodily harm. To request an instruction on a lesser included offense would have confused the jury with inconsistent theories of Turner's defense, and/or reduced the hope of attaining a complete acquittal. Harris, supra, at 533, citing State v. Moore (1994),97 Ohio App.3d 137, 149-150. Had the jury believed Turner's theory, it would have been required to acquit him, finding him justified in using deadly force.
In conclusion, we find that the trial court did not commit any error, upon which to base a claim of plain error, in not instructing the jury on the lesser included offense, as the facts in this case do not present evidence to warrant a jury instruction on the offense of involuntary manslaughter based upon a misdemeanor assault.
 _________________________ FREDERICK N. YOUNG, J.
Accordingly, Turner's assignment of error is overruled.