[Cite as *State v. Barker*, 2019-Ohio-4891.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,            :

                                  No.  108182

    v.                                 :

JAMES BARKER,                           :

    Defendant-Appellant.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  REVERSED, VACATED, AND REMANDED
**RELEASED AND JOURNALIZED:**  November 27, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-624121-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel A. Cleary, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Francis Cavallo, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} Defendant-appellant, James Barker, appeals his conviction. He raises three assignments of error for our review:

> 1. There was insufficient evidence produced at trial to support a finding of guilt.
>
> 2. The guilty verdict in this case was against the manifest weight of the evidence.
>
> 3. The trial court committed plain error by instructing the jury on the definition of "official proceeding" where no evidence of one existed in the record.

{¶ 2} Finding merit to his first assignment of error, we reverse, remand, and vacate Barker's conviction for tampering with evidence.

## I.     Procedural History and Factual Background

{¶ 3} On December 18, 2017, the Cuyahoga County Grand Jury indicted Barker for one count of rape in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree; four counts of rape in violation of R.C. 2907.02(A)(2), felonies of the first degree; three counts of kidnapping in violation of R.C. 2905.01(A)(4), felonies of the first degree; and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. One of the kidnapping counts carried a sexual motivation specification.[1]

{¶ 4} Barker pleaded not guilty, and the case proceeded to a jury trial in August 2018. The following evidence was presented.

---

[1] The indictment did not identify the evidence that Barker allegedly tampered with, but a review of the record shows that the state argued it was a mattress that Barker threw out.

{¶ 5} N.C., the alleged victim, and her four-year-old child traveled from Las Vegas to Cleveland in December 2017 with a friend, intending to stay in Cleveland. When she arrived at the Greyhound station in downtown Cleveland on the night of December 3, however, the friend and the friend's boyfriend left N.C. there. N.C. also testified that she arrived in Cleveland on December 1 and that she actually stayed with her friend, but her friend kicked her out on December 3. N.C. called 211, the homeless hotline, and was told where to go for assistance.

{¶ 6} On her way to a shelter, N.C. met Barker at a bus stop near the Greyhound Station, and he offered N.C. and her child a place to stay that night. N.C. agreed, and she said that while at Barker's apartment, located on Hough Avenue in Cleveland, he gave them iced tea and toys and allowed them to clean up. N.C. stated that after putting her child to sleep in a separate room, she smoked marijuana with Barker. She testified that she then fell asleep with her child, but woke up in a different room with Barker having sex with her. N.C. said she did not give Barker permission to have sex with her and could not call 911 because her phone died. N.C. stated that after Barker finished having sex with her, he made her take a bath.

{¶ 7} The next morning on December 4, N.C. testified that Barker took her and her child to a food pantry. They later returned to his apartment where they again smoked marijuana and had sex multiple times. N.C. stated that she never consented to having sex.

{¶ 8} The next day, on December 5, N.C. said Barker took her to the social security office in Cleveland, but it was closed, and that he then took her to the welfare

office. N.C. agreed that the welfare office was a county building and that there were police officers present, but she said she did not tell anyone about what was happening to her because Barker was standing nearby while she filled out an application. She stated she tried to make eye contact with the welfare employee and have him read her lips, but that she did not actually tell the employee about Barker. She said they later returned to his apartment, smoked marijuana, and Barker began "insinuating oral sex." She said that she did not remember what happened next, but that they had sex two more times that night. She stated during that night, she "started to get like, you know, this is just too much," and she "gave [Barker] the indication and let him know that [she did not] want to do this[.]" According to N.C., Barker apologized and said that he did not "mean to be a brute."

{¶ 9} When asked if she tried to fight him off, N.C. testified, "I would push him, you know. Tell him you're hurting me, I'm tired, you know. I didn't want to say specifically, you know, anything that would have him choke me or, you know what I'm saying, he was a little bigger than me." She testified that that night, however, she told Barker that the sexual encounters were hurting her and that she was uncomfortable. N.C.'s testimony was not clear on when she told Barker about being hurt and uncomfortable, specifically, before, during, or after the sexual encounters had taken place that night.

{¶ 10} On December 6, N.C. was able to turn on her phone and call 211 to find a shelter. The phone call, which was admitted into evidence, lasted approximately 15 minutes and took place outside of Barker's apartment. During the

phone call, N.C. said she was not comfortable where she was staying, which she said was "just [with] a friend."

{¶ 11} Despite being able to make phone calls, N.C. stated that she did not call 911 or tell the 211 employee about Barker's actions because she was afraid he would overhear her.

{¶ 12} N.C. said that during that morning, Barker threw out his mattress which was where most of the sexual encounters had occurred. She said she "had no idea" why he threw the mattress away, but stated that he "probably" threw it away because the night before, she "started to get like, you know, this is just too much and I need to be able to leave."

{¶ 13} N.C., who was 35 years old, testified that that despite being afraid of Barker, who was 62 years old, he never threatened her.

{¶ 14} N.C. testified that on December 6, Barker drove her to Frontline Services[2] to obtain assistance and find a shelter. She said she did not tell him that she wanted to go to Frontline so she could leave and live somewhere else, but instead told him that she wanted to get some food and "hygienic stuff." She said, "I didn't let [Barker] know anything."

{¶ 15} At Frontline, N.C. met with two employees, Kashonda Murphy and Anderson Pope, outside of Barker's presence. N.C. testified that she told Murphy that "the man that brought [her] in * * * [kept] having sex with her and [she did not]

---

[2] Frontline Services is a nonprofit organization that provides support services to homeless individuals as far as housing, shelter, health services, and crisis stabilization.

want to have sex with him." N.C. never explicitly told the employees that Barker "raped" her.

{¶ 16} Murphy testified that N.C. told her that she had to "exchange sex to stay" with Barker and that "she felt very uncomfortable doing that." Murphy testified that although N.C. appeared scared, N.C. never told her that Barker raped her.

{¶ 17} Anderson met with N.C. after Murphy because he had more experience dealing with "difficult cases." Anderson met with Barker in the lobby and went back to Barker's apartment with Barker to retrieve N.C.'s belongings. He said he went with Barker because N.C. said she was scared, wanted her belongings, and did not "want to continue to keep kissing on him in order to stay there in the home." Anderson said Barker was "very cooperative" and offered no resistance.

{¶ 18} After meeting with Anderson, N.C. said she met with police officers and went to the hospital to have a rape kit performed. She said she never offered to have sex with Barker to stay at his apartment and that she never consented to the sexual encounters.

{¶ 19} The next day, on December 7, Barker returned to Frontline and spoke to Anderson about assistance in finding a new bed because his bed was broken. Anderson gave Barker a referral.

{¶ 20} On the night of December 7, police officers went to Barker's home after receiving the case report. According to officers, they told him why they were

there and Barker cooperated. They said that there was not a mattress in the apartment. They arrested him and transported him to jail.

{¶ 21} The state rested, and Barker moved for an acquittal pursuant to Crim.R. 29, which the trial court denied.

{¶ 22} Barker did not present any witnesses or evidence in his defense, and he renewed his motion for an acquittal, which the trial court again denied.

{¶ 23} On August 13, 2018, the jury found Barker guilty of tampering with evidence, could not reach a verdict as to one of the rape counts (Count 6), and found Barker not guilty of the remaining counts. The trial court declared a mistrial as to Count 6, and the state subsequently moved to dismiss that count, which the trial court granted.

{¶ 24} On August 30, 2018, the trial court sentenced Barker to prison for one year and advised him that he was subject to a discretionary three-year term of postrelease control. The trial court also credited Barker for 265 days of jail-time credit.

{¶ 25} It is from this judgment that Barker now appeals.

## II.    Law and Analysis

{¶ 26} In his first assignment of error, Barker argues that his conviction for tampering with evidence was not supported by sufficient evidence.

{¶ 27} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury

verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). When reviewing a sufficiency of the evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 28} Tampering with evidence has three elements: "(1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11. Here, Barker argues that there was insufficient evidence that he was aware of any legal proceeding or investigation against him, the first element.

> Tampering with evidence under R.C. 2921.12(A)(1) requires a person to act with purpose, meaning that the person has a specific intention to cause a certain result. *See State v. Skorvanek*, 182 Ohio App.3d 615, 2009-Ohio-1709, 914 N.E.2d 418, ¶ 21 (9th Dist.); R.C. 2901.22(A). When determining whether the defendant acted purposely, a defendant's state of mind may be inferred from the surrounding circumstances. *State v. Rock*, 3d Dist. Seneca No. 13-13-38, 2014-Ohio-1786, ¶ 13, citing *Skorvanek* at ¶ 21.

*State v. Sharp*, 8th Dist. Cuyahoga No. 103445, 2016-Ohio-2634, ¶ 19.

{¶ 29} Regarding a defendant's knowledge of an ongoing or likely proceeding or investigation, "there is [commonly] no direct evidence of a defendant's state of mind so the state must rely on circumstantial evidence to satisfy this element of its case. A defendant's state of mind may be inferred from the totality of the circumstances." *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 43 (8th Dist.). Circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988).

{¶ 30} The likelihood of an investigation is measured at the time of the alleged act of tampering. *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, ¶ 21. "[T]he state must demonstrate that the accused knew of a pending official proceeding or investigation or knew that such a proceeding or investigation was likely to be instituted at the time of the concealment." *Id.* at ¶ 2.

{¶ 31} "Knowledge that a criminal investigation is imminent is based upon a reasonable person standard." *Sharp*, 8th Dist. Cuyahoga No. 103445, 2016-Ohio-2634, at ¶ 18, citing *State v. Workman*, 2015-Ohio-5049, 52 N.E.3d 286, (3d Dist.).

{¶ 32} The state argues that the testimony presented at trial shows that Barker "knew that an investigation was likely forthcoming because he had been sexually assaulting the victim on that mattress over a period of days and she was

about to go to a government building and talk about housing." It points out that Barker threw out the mattress after N.C. told him that the sex was hurting her and learning that N.C. wanted to go to Frontline Services. The state also argues that whether Barker knew "the extent of the claims that N.C. was going to make is immaterial" and that it was "reasonable [for the jury] to believe that a sexual assault [was] likely to be reported and [Barker took] steps to thwart the investigation by removing" the mattress.

{¶ 33} Barker argues that the testimony shows that he threw out the mattress before N.C. ever went to Frontline and later reported an alleged crime to police, which means that there was not an investigation or proceeding against him at that time. Therefore, he argues, the "only remaining question" is whether he "knew or should have known that such a proceeding or investigation was about to be or likely to be instituted." He argues that N.C.'s testimony was insufficient to establish that he knew or should have known about such a proceeding or investigation because N.C. acted as a "willing partner," did not accuse him of rape or any other crime prior to throwing out his mattress, "deliberately concealed from [Barker] her intention to file any sort of complaint[,]" and did not give Barker any indication that she was going to report a crime. We agree.

{¶ 34} Upon review of the evidence presented, we find that the state failed to provide sufficient evidence that Barker knew or should have known that such a proceeding or investigation was about to be or likely to be instituted. N.C. spent multiple days and nights with Barker at his apartment, during which time she

smoked marijuana with him. She also traveled to a food pantry and the welfare office with Barker, where she did not tell or indicate to anyone that Barker was raping her and then returned to Barker's apartment after each of those visits. There was also testimony that N.C. admitted that she and her child were able to stay with Barker in exchange for sex and that she only stopped staying with him because she no longer wanted to have sex with Barker.

{¶ 35} Further, and most importantly, N.C. testified that she only told Barker that the sexual encounters were hurting her and made her uncomfortable on December 5, the last night she and her child stayed with Barker. While she testified that the sex hurt her, she did not tell Barker that their prior sexual encounters were not consensual, that she was going to report him, or that she wanted to leave his apartment and stay elsewhere. Her testimony is not clear if any sexual encounters occurred after she told Barker to stop.

{¶ 36} N.C. never told or in any way indicated to Barker or anyone else before he threw out his mattress that she planned on speaking with police or reporting him. N.C. specifically testified that she did not "let [Barker] know anything" before going to Frontline Services, including the fact that she wanted to leave and live somewhere else. When Barker took N.C. to Frontline, which was after he had already thrown out the mattress, N.C. did not tell either Murphy or Pope that Barker raped her. In fact, Anderson said that he would have called the police had he thought that was the case. N.C. did not indicate to anyone that Barker was raping her until she met with police and after Barker had already thrown the mattress out.

{¶ 37} While the timing of Barker throwing out his mattress the next morning may be odd, there was testimony indicating that the bed was broken and that Barker actually returned to Frontline himself to find a new bed the day after N.C. left. We find that the timing alone, which occurred after N.C. told Barker only that the sex hurt and made her uncomfortable and in no way indicated that she would report Barker for a crime, is not sufficient to show that he knew an investigation or proceeding was likely.

{¶ 38} In sum, there was insufficient evidence to show that Barker knew or should have known that a proceeding or investigation was likely at the time he threw out his mattress. Accordingly, we sustain Barker's first assignment of error. Our disposition of his first assignment of error renders his second and third assignments of error moot.

{¶ 39} Judgment reversed and remanded for the trial court to vacate Barker's conviction for tampering with evidence.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been reversed and vacated, any bail pending is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
RAYMOND C. HEADEN, J., CONCUR