[Cite as *State v. Bumpass*, 2024-Ohio-2528.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-10-068 |
| | : | O P I N I O N |
| - vs - | | 7/1/2024 |
| | : | |
| JACOB BUMPASS, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2020 CR 000590


Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas A. Horton, Assistant Prosecuting Attorney, for appellee.

Patituce & Associates, LLC, and Megan M. Patituce and Joseph C. Patituce, for appellant.



**M. POWELL, J.**

{¶ 1} Appellant, Jacob Bumpass, appeals his conviction in the Clermont County Court of Common Pleas for tampering with evidence and abuse of a corpse.

{¶ 2} This case stems from the September 2010 disappearance of 17-year-old P.J., whose partial remains were discovered in March 2020 in a wooded area off Mathis

Road, near the intersection of State Route 32 and State Route 276 in Clermont County, Ohio. Following an investigation, appellant was indicted on July 28, 2020, for tampering with evidence and abuse of a corpse. The matter proceeded to a jury trial. P.J.'s mother ("Donna"), P.J.'s sister ("Brittany"), P.J.'s boyfriend ("Ronnie"), several law enforcement officers, a forensic anthropologist, a cell phone data expert, and two friends of appellant ("Tawny" and "John") testified on behalf of the state. Appellant did not testify or present witnesses on his behalf. The trial evidence revealed the following.

{¶ 3} On September 22, 2010, P.J. was living with her mother Donna, her grandmother, and her siblings, including Brittany, at Donna's home in Florence, Kentucky. Brittany was going to spend the night with her boyfriend Michael at Michael's apartment on Nancy Street in Covington, Kentucky. The Nancy Street building was a multi-family home; Michael occupied the upstairs apartment; Jason, a family friend, occupied the downstairs apartment. P.J. told Brittany that she would join her later that night. Brittany left for Michael's apartment around 5:00 p.m.

{¶ 4} P.J. did not have a phone of her own and typically used her grandmother's cell phone, which had an "859" area code. It is undisputed that on the night of her disappearance, P.J. used her grandmother's cell phone to talk and text with her boyfriend Ronnie. P.J. and Ronnie last talked or texted between 8:00 p.m. and 9:00 p.m.

{¶ 5} P.J. began texting with appellant around 11:11 p.m. The two were friends. They agreed that appellant would come pick up P.J. The last text between P.J. and appellant occurred at 12:53 a.m. on September 23, 2010, when appellant texted P.J., "come out I'm almost there." Pings from appellant's cell phone showed that between 12:35 a.m. and 12:53 a.m. appellant travelled north past P.J.'s home and then turned back toward her home.

{¶ 6} During the time P.J. was texting with appellant, she was also texting with

Jason, the family friend and downstairs tenant in the Nancy Street building. The texts between Jason and P.J. suggest that P.J. was planning on coming to the Nancy Street building to visit with Brittany, Michael, and Jason. At 12:54 a.m. on September 23, 2010, Jason texted P.J., "Can't wait to chill with u homie." At 12:55 a.m., P.J. texted Jason, "I'll call u when I'm on my way I won't have this phone it will be a 513 [area code] number." Appellant's cell phone number was a "513" area code number. P.J. told Donna she was leaving. Believing that P.J. was leaving with Jason, an individual Donna knew and trusted, to spend time with Brittany, Donna was not concerned about P.J. leaving.

{¶ 7} Between 1:20 a.m. and 2:00 a.m., pings from appellant's cell phone placed it near appellant's Taylor Mill, Kentucky home. During that time, appellant and his friend John were texting, arranging to meet up at appellant's home. The record indicates that John stopped by appellant's home shortly after 1:40 a.m. and that he saw P.J. sitting on a couch in appellant's living room. John left appellant's home ten minutes later. Appellant's cell phone records show that he placed a telephone call in the vicinity of his home at 2:58 a.m.

{¶ 8} At 4:13 a.m., Tawny texted appellant. Appellant's cell phone pinged from a cell tower in Batavia, Clermont County, Ohio, slightly north of S.R. 32. Five minutes later, at 4:18 a.m., appellant replied to Tawny, and his cell phone pinged from a different cell tower located off Half-Acre Road, in Clermont County, slightly south of S.R. 32. P.J.'s remains were ultimately found 1.1 miles away from the Half-Acre Road tower, in a wooded area slightly east of the Half-Acre Road tower and slightly south of the intersection of S.R. 32 and S.R. 276. Around 5:00 a.m., appellant's cell phone pinged from a cell tower slightly north of the Ohio River along I-275. At 9:45 a.m., appellant's cell phone pinged from a cell tower near his Taylor Mill, Kentucky home.

{¶ 9} Thus, in summary, the various pings from appellant's cell phone during the

early morning hours of September 23, 2010, indicate that sometime after 3:00 a.m., he travelled from his Taylor Mill, Kentucky home to Clermont County, Ohio near where P.J.'s partial remains were found, and then returned to his home around 5:00 a.m. Since September 23, 2010, there is no record of appellant's cell phone pinging from the Half-Acre Road tower or a Batavia cell tower.

{¶ 10} Around 9:00 a.m. on September 23, 2010, Ronnie tried to contact P.J.; she did not respond. Ronnie then began calling P.J.'s friends, but none of them had seen or had contact with her. Ronnie eventually called P.J.'s grandmother who provided him with the last number P.J. had texted to from her cell phone. Recognizing the number as belonging to appellant, Ronnie called him to inquire about P.J. Appellant told Ronnie that he had dropped off P.J. at the intersection of 15th and Scott Streets in Covington and that he had not heard from her since. The intersection was deemed to be a high crime area in 2010 and is several blocks away from the Nancy Street building where P.J. was to join Brittany. Witnesses testified there was no reason for P.J. to be dropped off at that location. Appellant's cell phone records/pings do not place appellant in the area of 15th and Scott Streets in Covington on September 23, 2010, and in fact indicate he had not been in that area since September 18, 2010.

{¶ 11} Fearing something had happened to P.J., Brittany and Ronnie called police to file a missing person report. A Covington Police Department sergeant contacted appellant regarding P.J.'s whereabouts. Appellant informed the sergeant that he had dropped off P.J. at 15th and Scott Streets in Covington at 1:00 a.m., and further stated, "I just don't want this to come back on me." The statement struck the sergeant as odd because P.J. had only been missing a short while and there was no reason to believe anything was wrong. Later that evening, Jason contacted appellant about P.J. Appellant told Jason that he had dropped off P.J. at 15th and Scott Streets in Covington between

1:00 a.m. and 1:30 a.m.

{¶ 12} Appellant told Tawny that after he picked up P.J. at her mother's home, the two went to his home where P.J. redid her makeup, and that he subsequently dropped her off at 15th and Scott Streets in Covington. Tawny testified that appellant further stated, "What if she doesn't turn up? You know, I'm the last one with her. That's going to look bad." The statement struck Tawny as odd because P.J. had only been missing a short while.

{¶ 13} Upon finding out that P.J. was with appellant the night she disappeared, Donna went to his home. Tawny was present at the time and witnessed the exchange. Although appellant answered the door, he refused to let Donna come in to talk. Appellant told Donna he had dropped off P.J. at 15th and Scott Streets at P.J.'s request, stated that P.J. never used his cell phone to call or text anyone, and when asked if Donna could check his phone to make sure P.J. did not use it at all, replied that his phone automatically deleted information every 24 hours. Appellant refused to help, was very short with Donna, and ultimately shut the door. Tawny found appellant's behavior unusual and stated she did not understand why he refused to help.

{¶ 14} After appellant's cell phone records placed him in the vicinity of where P.J.'s remains were ultimately found, police went to his home on October 4, 2010, to question him. Appellant did not answer the door and was found trying to sneak out of the back of his home.

{¶ 15} Testimony at trial also revealed that appellant changed his cell phone number on September 29, 2010, six days after he was last seen with P.J. at his home, that he never called or texted P.J. after their last 12:43 a.m. text on September 23, 2010, that he never participated in searching for P.J., and that he never reached out to Donna. Multiple searches were conducted over the years. One such search was conducted in

October 2010 in the area of East Fork State Park in Clermont County because appellant's cell phone had pinged from the nearby Batavia and Half-Acre Road cell towers on the morning of September 23, 2010.  The evidence shows that the areas canvassed as part of that search stopped roughly one mile south of where P.J.'s remains were found.

{¶ 16} On July 24, 2023, the jury found appellant guilty as charged.  The trial court sentenced appellant to 36 months in prison for tampering with evidence and 12 months in prison for abuse of a corpse and ordered that the prison terms be served consecutively.

{¶ 17} Appellant appeals his conviction, raising three assignments of error.  The first two assignments of error will be addressed together.

{¶ 18} Assignment of Error No. 1:

{¶ 19} THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO PROVE MR. BUMPASS'S GUILT BEYOND A REASONABLE DOUBT.

{¶ 20} Assignment of Error No. 2:

{¶ 21} MR. BUMPASS'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 22} Appellant argues that his conviction for tampering with evidence and abuse of a corpse are not supported by sufficient evidence and are against the manifest weight of the evidence because the state failed to prove he was the individual who committed the offenses.

{¶ 23} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  *State v. Hibbard*, 2023-Ohio-983, ¶ 9 (12th Dist.).  The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

- 6 -

beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 24} To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Hibbard* at ¶ 10. An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* "[A] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Davis*, 2011-Ohio-2207, ¶ 40 (12th Dist.).

{¶ 25} Appellant was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." Appellant was also convicted of abuse of a corpse in violation of R.C. 2927.01(B), which provides, "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." "[E]vidence of an attempt to conceal a body is sufficient to sustain a conviction for gross abuse of a corpse." *State v. Whitaker*, 2022-Ohio-2840, ¶ 80.

{¶ 26} In his first and second assignments of error, appellant does not challenge the state's evidence supporting the statutory elements of the offenses. Rather, appellant challenges the evidence tending to identify him as the perpetrator of the offenses, thus

raising only an identity argument. It is well established that to warrant a conviction, the evidence must establish beyond a reasonable doubt the identity of the accused as the person who committed the crime at issue. *Hibbard*, 2023-Ohio-983 at ¶ 20. The identity of the accused as the perpetrator of the crime may be established by direct or circumstantial evidence. *Id.* Circumstantial and direct evidence have the same probative value. *Id.*

**{¶ 27}** Upon thoroughly reviewing the record, we find that appellant's conviction for tampering with evidence and abuse of a corpse is supported by sufficient evidence and is not against the manifest weight of the evidence. Though the state's case was based on circumstantial evidence, the state presented ample evidence that appellant was the individual who disposed of P.J.'s body in a wooded area off Mathis Road, near the intersection of S.R. 32 and S.R. 276 in Clermont County, Ohio.

**{¶ 28}** The record shows that on the evening of September 22, 2010, appellant agreed to pick up P.J. from her house, and texted her at 12:53 a.m. on September 23, 2010, that he was almost at her house. Pings from appellant's cell phone showed that between 12:35 a.m. and 12:53 a.m. appellant travelled north past P.J.'s home and then turned back toward her home. Subsequent pings between 1:20 a.m. and 2:00 a.m. placed appellant near his home in Taylor Mill, Kentucky. John stopped by appellant's home around 1:40 a.m. to see him. There, he saw P.J. sitting on a couch in appellant's living room. John stayed at the house ten minutes and then left. Pings from appellant's cell phone show that sometime after 3:00 a.m., appellant travelled from his home to Clermont County, Ohio near where P.J.'s remains were found and returned to his home around 5:00 a.m. Specifically, appellant's cell phone pinged from a cell tower in Batavia, Clermont County, Ohio, slightly north of S.R. 32, at 4:13 a.m., when Tawny texted appellant about her child. Appellant's cell phone then pinged from the Half-Acre Road

tower, slightly south of S.R. 32, five minutes later, at 4:18 a.m. when he texted back Tawny. P.J.'s remains were ultimately found 1.1 miles away from the Half-Acre Road tower, in a wooded area slightly east of the Half-Acre Road tower and slightly south of the intersection of S.R. 32 and S.R. 276. There is no evidence that appellant loaned or parted with his phone that morning. The record shows that appellant has not been in this Clermont County area since September 23, 2010.

**{¶ 29}** Appellant consistently told Donna, Ronnie, Jason, Tawny, and police that he dropped off P.J. at the corner of 15th and Scott Streets in Covington, a then well-known high-crime area, between 1:00 a.m. and 1:30 a.m. However, the evidence presented at trial belies appellant's claim. Appellant's cell phone records show that appellant was not in the area of 15th and Scott Streets at that time on September 23, 2010, and in fact, had not been there since September 18, 2010; and that he picked up P.J. just before 1:00 a.m. on September 23, 2010, and brought her to his home where they remained until 2:00 a.m. Furthermore, John's testimony placed P.J. in appellant's living room around 1:45 a.m.

**{¶ 30}** Additionally, although they were friends, appellant never called or texted P.J. after their last 12:43 a.m. text on September 23, 2010, and never participated in searching for P.J. Instead, because P.J. was last seen with him, appellant immediately worried that "[it's] going to look bad" and "I just don't want this to come back on me." Appellant also changed his cell phone number less than a week after P.J. was last seen with him and tried to sneak out of his home when police came to his home to question him.

**{¶ 31}** It is well established that it is the trier of fact who makes determinations of credibility and the weight to be given to the evidence presented at trial. *State v. Martino*, 2018-Ohio-2882, ¶ 13 (12th Dist.). It is equally well established that a conviction is not

against the manifest weight of the evidence merely because the trier of fact believed the testimony of the state's witnesses. *Id.* The jury is free to believe or disbelieve the testimony of any witness at trial. *State v. Keller*, 2019-Ohio-1397, ¶ 15 (12th Dist.).

{¶ 32} In light of the foregoing, we find that the evidence presented at trial does not weigh heavily in favor of acquittal and that the jury did not clearly lose its way and create a manifest miscarriage of justice in finding appellant guilty of tampering with evidence and abuse of a corpse. A determination that a conviction is supported by the manifest weight of the evidence is also dispositive of the issue of sufficiency. *Davis*, 2011-Ohio-2207 at ¶ 40. Appellant's conviction for tampering with evidence and abuse of a corpse is therefore supported by sufficient evidence and is not against the manifest weight of the evidence.

{¶ 33} Appellant's first and second assignments of error are overruled.

{¶ 34} Assignment of Error No. 3:

{¶ 35} THE TRIAL COURT ERRED IN FAILING TO ORDER A MISTRIAL AFTER REPEATED, EMOTIONAL OUTBURSTS OF THE STATE'S FIRST WITNESS, D.J.

{¶ 36} Appellant argues the trial court erred by failing to grant a mistrial following emotional and prejudicial outbursts by Donna, the state's first witness, during her testimony on direct and cross-examination.

{¶ 37} The record shows that Donna was emotional during her testimony and oftentimes not responsive to questions. Near the end of her direct examination, when asked whether law enforcement had notified her that P.J's remains had been found, Donna replied,

> Yes. And it was over three years ago. And I was relieved that we could finally bring her home. And I don't know why someone would make us wait this long instead of just saying, I don't want to drag you through all of this for three years. I'll just take my little four years and you can take your baby home

- 10 -

and have a funeral.

{¶ 38} Defense counsel objected; a sidebar discussion ensued. The state asked the trial court to strike Donna's statements; defense counsel moved for a mistrial. The trial court sustained defense counsel's objection and instructed the jury that Donna's testimony was nonresponsive and inappropriate and that it was stricken from the record and should not be considered for any purpose. During a post-lunch discussion outside the jury's presence, defense counsel restated the basis for a mistrial. The trial court denied the motion, finding that the curative instruction it promptly provided was a sufficient remedy and that Donna's outburst did not "rise to the level where Mr. Bumpass cannot have a fair trial still."

{¶ 39} On cross-examination, when asked whether it was common for P.J. to go out late at night, Donna replied,

> Oh, well, I don't know. You're a parent. I guess, was it—sure, it was probably late for her to go out. Am I on trial for being a bad mother? Because I'll say, I'm a bad mother. My daughter is gone. Okay? I should have been a better mom and not have let her leave. I know that. You don't have to remind me of it. I think about it every day. It was too late for me to let her leave. And I wish I would not have let her leave.

{¶ 40} The trial court interjected and advised Donna to take a moment and compose herself, to answer defense counsel's questions, and not to argue with him. When asked about P.J.'s independent streak, Donna responded, "She's not here right now to defend herself. I don't understand this process that's going on right now," and "if she was a bad kid, that will help you understand what happened to her? I'm asking, is that what this is about? Am I wrong?" The trial court advised a surprised Donna that she did not get to ask questions. Defense counsel did not renew his motion for a mistrial.

{¶ 41} Later during Donna's cross-examination, the state objected to a question by defense counsel and a side bar discussion ensued. During the side bar, defense counsel

lamented about Donna's tearful testimony and wondered how appellant could have a fair trial under these circumstances. The trial court commented on Donna's failure to provide responsive answers to defense counsel's questions and advised the state to instruct Donna to answer defense counsel's specific questions and not to argue with defense counsel. The state clarified that the remedy for Donna's failure to follow the court's instructions would be an order of contempt. Defense counsel raised the prospect of striking Donna's testimony, but the trial court was reluctant to take that action. However, defense counsel did not renew his motion for a mistrial. Ultimately, the trial court instructed the state to exert some control over its witness, and Donna was given a moment to compose herself. After the side bar and outside the jury's presence, the trial court advised Donna to follow the court's instructions and provide responsive answers to defense counsel's questions.

{¶ 42} In general, a mistrial should not be granted unless the substantial rights of the defendant have been materially affected. *State v. Morales*, 32 Ohio St.3d 252, 255 (1987). The decision to grant or deny a mistrial is a matter within the sound discretion of the trial court and may not be disturbed on appeal absent a clear showing that the court abused its discretion. *Id.*

{¶ 43} The impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record. *State v. Hill*, 75 Ohio St.3d 195, 204, 1996-Ohio-222. "'Was the jury disturbed, alarmed, shocked, or deeply moved? Was the incident of such a nature as to have necessarily influenced the verdict of conviction? These questions necessarily depend on facts which no record can reflect.'" *Id.*, quoting *State v. Bradley*, 3 Ohio St.2d 38, 40 (1965). Only the trial judge can make the necessary factual determinations on these questions. A reviewing court grants "great deference to the trial court's decision in this area [because] the trial judge is in the best position to

determine whether the situation in his courtroom warrants the declaration of a mistrial." *State v. Glover*, 35 Ohio St.3d 19, 19 (1988). In the absence of clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed on appeal. *Morales* at 255.

{¶ 44} Upon reviewing the record, we find no abuse of discretion in the trial court's failure to grant a mistrial. Following Donna's emotional outburst on direct examination, the trial court promptly instructed the jury that Donna's testimony was nonresponsive and inappropriate and that it was stricken from the record and should not be considered for any purpose. In addition to this curative instruction, the trial court further instructed the jurors before they retired to deliberate to "make your findings with intelligence and impartiality and without bias and sympathy[.] You must not be influenced by any consideration of sympathy or prejudice." A jury is presumed to follow the instructions, including curative instructions, given to it by a trial judge. *State v. Garner*, 74 Ohio St.3d 49, 59, 1995-Ohio-168. Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible. *Id.* There is no clear evidence in the record indicating that the jury was improperly affected by Donna's emotional testimony on the stand. The trial court was in the best position to gauge the totality of the impact of Donna's testimony on the jury. "The reaction of the jury to an emotional display by a witness involves perceptions which cannot be adequately reflected in the record on appeal[.]" *State v. Hill*, 1994 Ohio App. LEXIS 5733, *12 (1st Dist. Dec. 21, 1994). The trial court determined that Donna's demeanor and testimony did not warrant a mistrial. That decision will not be disturbed on appeal.

{¶ 45} Appellant's third assignment of error is overruled.

**{¶ 46}** Judgment affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.